David W. Shapiro DS-8121
BOIES, SCHILLER & FLEXNER LLP
1999 Harrison Street, Suite 900
Oakland, CA 94612
Telephone: (510) 874-1000
Facsimile: (510) 874-1460
dshapiro@bsfllp.com

Attorneys for defendant Bradley Stinn

ORIGINAL

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ APR 28 2011 ★

BROOKLYN OFFICE

CV 11-2071

07-CR-113-NG-RML

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------x

UNITED STATES OF AMERICA

   - against -

BRADLEY STINN,

                Defendant.

--------------------------------------------------x

GERSHON, J

MEMORANDUM OF LAW IN
SUPPORT OF MOTION TO
VACATE AND SET ASIDE
JUDGMENT OF CONVICTION
AND SENTENCE PURSUANT TO
28 U.S.C. §2255

## TABLE OF CONTENTS

Preliminary Statement and Summary of Argument ................................................... 1

Procedural History .................................................................................................... 3

Legal Background .................................................................................................... 7

The Stinn Trial Evidence of Dishonest Services ..................................................... 13

The Government's Salary Theory .......................................................................... 15

The Government's Bonus Theory .......................................................................... 23

The Government's Right to Control Money Theory ................................................ 25

The Jury Instructions and Verdict Form ................................................................ 27

ARGUMENT -  STINN'S CONVICTION AND SENTENCING MUST BE
VACATED .............................................................................................................. 29

    I.      *SKILLING* APPLIES TO THIS MOTION UNDER.
            28 U.S.C. § 2255 ................................................................ 30

    II.     STINN HAS NOT WAIVED A *SKILLING* ARGUMENT ................. 31

    III.    *SKILLING* MANDATES THAT STINN'S CONVICTION BE
           VACATED BECAUSE THE JURY WAS AUTHORIZED TO
           CONVICT ON THE SALARY THEORY ............................................... 32

           A.   The Salary Theory Was Expressly Rejected by the Supreme
                Court ...................................................................................... 32

           B.   The Government's Failure to Cite Section 1346 in the Indictment
                or Request a Jury Instruction on "Honest Services" Does Not
                Change the Result ................................................................... 36

           C.   The Salary Theory Tainted the Entire Trial ............................... 39

D.    The Government's Successful Objection to a Special Verdict
Forecloses Any Harmless Error Analysis ................................... 40

IV.    THE GOVERNMENT'S "BONUS" AND "LOSS OF CONTROL"
THEORIES ARE CONSTITUTIONALLY DEFECTIVE ................... 41

A.    The Bonus Theory Is Defective .................................................. 41

B.    The "Right to Control" Theory is Defective ............................. 43

CONCLUSION ..................................................................................... 47

# TABLE OF AUTHORITIES

**CASES**

*Alaska Electrical Pension Fund v. Adecco S.A.,*
   371 F. Supp. 2d 1203 (S.D. Cal. 2005)................................................................ 35

*Black v. United States,*
   79 USLW 3494 (Feb. 17, 2011)(No. 10-1038) .................................................. 46

*Bouie v. City of Columbia,*
   378 U.S. 347 (1964).............................................................................................. 36

*Claire's Stores, Inc. v. Abrams,*
   No. 86 C 9851, 1989 WL 134959 (N.D. Ill. Oct. 16, 1989)......................... 34, 42

*Cleveland v. United States,*
   531 U.S. 12 (2000)................................................................................................ 37

*Cuoco v. United States,*
   208 F.3d 27 (2d Cir. 2000) .................................................................................. 30

*Danis v. USN Commc'ns, Inc.,*
   121 F. Supp. 2d 1183 (N.D. Ill. 2000)................................................................ 20

*Davis v. United States,*
   417 U.S. 333 (1974)............................................................................................. 31

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,*
   553 F.3d 187 (2d Cir. 2009) ............................................................................... 34

*Geddings v. United States,*
   No. 5:08-CV-425, 2010 WL 2639920 (E.D.N.C. June 29, 2010)...................... 31

*Hedgpeth v. Pulido,*
   555 U.S. 57 (2008)............................................................................................... 40

*In re Federated Department Stores, Inc., Sec. Litig.,*
   No. 00 CV 6362 (RCC), 2004 WL 444559 (S.D.N.Y. Mar. 11, 2004).............. 35

*In re GlenFed, Inc. Sec. Litig.,*
   42 F.3d 1541 (9th Cir. 1994) .............................................................................. 35

iii

*In re MCI Worldcom, Inc. Sec. Litig.*,
   191 F. Supp. 2d 778 (S.D. Miss. 2002) ............................................... 35

*In re Miller Indus., Inc.*,
   120 F. Supp. 2d 1371 (N.D. Ga. 2000) ............................................... 35

*Ingber v. Enzor*,
   841 F.2d 450 (2d Cir. 1988) ............................................... 30

*Lomelo v. United States*,
   891 F.2d 1512 (11th Cir. 1990) ............................................... 31

*McNally v. United States*,
   483 U.S. 350 (1987) ............................................... passim

*Monsanto v. United States*,
   348 F.3d 345 (2d Cir. 2003) ............................................... 46

*New Hampshire v. Maine*,
   532 U.S. 742 (2001) ............................................... 40

*Piambino v. Bailey*,
   610 F.2d 1306 (5th Cir. 1980) ............................................... 26

*Reed v. Ross*,
   468 U.S. 1 (1984) ............................................... 31

*Rivers v. Roadway Express, Inc.*,
   511 U.S. 298 (1994) ............................................... 30

*Schriro v. Summerlin*,
   542 U.S. 348 (2004) ............................................... 30

*SEC v. Guenthner*,
   395 F. Supp. 2d 835 (D. Neb. 2005) ............................................... 20

*Siddiqi v. United States*,
   98 F.3d 1427 (2d Cir. 1996) ............................................... 46

*Skilling v. United States*,
   130 S.Ct. 2896 (2010) ............................................... passim

*Sorich v. United States,*
   129 S.Ct. 1308 (2009)...........................................................................31, 33

*South Cherry Street, LLC v. Hennessee Group LLC,*
   573 F.3d 98 (2d Cir. 2009) ...................................................................34, 35

*Stayton v. United States,*
   Nos. 09 Civ. 157, 09 Civ. 209, --- F. Supp. 2d ----, 2011 WL 691238 (M.D. Ala.
   Feb. 28, 2011) ......................................................................................31

*Stromberg v. People of State of California,*
   283 U.S. 359 (1931).............................................................................46

*Triestman v. United States,*
   124 F.3d 361 (2d Cir. 1997) ...............................................................31

*TSC Industries, Inc. v. Northway, Inc.,*
   426 U.S. 438 (1976).............................................................................26

*Underwood v. United States,*
   15 F.3d 16 (2d Cir. 1993) ....................................................................31

*United States v. Billmyer,*
   Nos. 94-29-01-JD, 94-29-03-JD, 94-29-04-JD, 1995 WL 54471 (D. N.H. Feb. 3,
   1995) ....................................................................................................33

*United States v. Bronston,*
   658 F.2d 920 (2d Cir. 1981) ................................................................44

*United States v. Collier,*
   No. 5:08-cr-40(HL), 2009 WL 88383 (M.D. Ga. 2009) ......................33

*United States v. Dennis,*
   786 F.2d 1029 (11th Cir. 1986) ..........................................................40

*United States v. Dinome,*
   86 F.3d 277 (2d Cir. 1996) ..................................................................45

*United States v. Ebbers,*
   458 F.3d 110 (2d Cir. 2006) ..................................................................6

*United States v. Finnerty,*
   533 F.3d 143 (2d Cir. 2008) ................................................................41

*United States v. Frost,*
    125 F.3d 346 (6th Cir. 1997) ................................................................. 9

*United States v. Goyal,*
    629 F.3d 912 (9th Cir. 2010) .......................................................... 5, 42

*United States v. Gray,*
    96 F.3d 769 (5th Cir. 1996) ................................................................. 9

*United States v. Handakas,*
    286 F.3d 92 (2d Cir.), *cert. denied*, 537 U.S. 894 (2002).................... 7

*United States v. Holly,*
    488 F.3d 1298 (10th Cir. 2007) ........................................................ 46

*United States v. Jackson,*
    196 F.3d 383 (2d Cir. 1999) ............................................................. 46

*United States v. Johnson,*
    457 U.S. 537 (1982)................................................................... 30, 34

*United States v. Kwiat,*
    817 F.2d 440 (7th Cir. 1987) .............................................................. 9

*United States v. Little,*
    889 F.2d 1367 (5th Cir. 1990) .......................................................... 44

*United States v. Mandel,*
    591 F.2d 1347 (4th Cir. 1979) ................................................ 2, 44, 45

*United States v. Margiotta,*
    646 F.2d 729 (2d Cir. 1981) ............................................................. 40

*United States v. Matthews,*
    787 F.2d 38 (2d Cir. 1986) ................................................................. 2

*United States v. McCourty,*
    562 F.3d 458 (2d Cir. 2009) ............................................................. 40

*United States v. Ogando,*
    968 F.2d 146 (2d Cir. 1992) ............................................................. 40

*United States v. Ogull*,
   149 F. Supp. 272 (S.D.N.Y. 1957) ..................................................................... 40

*United States v. Pforzheimer*,
   826 F.2d 200 (2d Cir. 1987) ............................................................................... 40

*United States v. Quinones*,
   511 F.3d 289 (2d Cir. 2007) ............................................................................... 41

*United States v. Quiroz*,
   22 F.3d 489 (2d Cir. 1994) ................................................................................. 41

*United States v. Ratcliff*,
   488 F.3d 639 (5th Cir. 2007) .............................................................................. 33

*United States v. Redzic*,
   569 F.3d 841(8th Cir. 2010) ........................................................................ 37, 38

*United States v. Rodolitz*,
   786 F.2d 77 (2d Cir. 1986) ................................................................................. 45

*United States v. Rossomando*,
   144 F.3d 197 (2d Cir. 1998) ............................................................................... 45

*United States v. Rybicki*,
   354 F.3d 124 (2d Cir. 2003) .............................................................. 7, 8, 11, 31

*United States v. Siegel*,
   717 F.2d 9 (2d Cir. 1983) ................................................................................... 13

*United States v. Skilling*,
   554 F.3d 529 (5th Cir. 2009) ............................................................................... 9

*United States v. Skilling*,
   No. 06–20885, --- F.3d ----, 2011 WL 1290805 (5th Cir. Apr. 6, 2011) ........... 41

*United States v. Stewart*,
   305 F. Supp. 2d 368 (S.D.N.Y. 2004) ............................................................... 34

*United States v. Thompson*,
   484 F.3d 877 (7th Cir. 2007) .............................................................................. 33

*United States v. Von Barta,*
  635 F.2d 999 (2d Cir. 1980) ........................................................................ 9, 45

*United States v. Wallach,*
  935 F.2d 445 (2d Cir. 1991) ....................................................................... passim

*United States v. Zauber,*
  857 F.2d 137 (3d Cir. 1988) ................................................................................ 45

*Yates v. United States,*
  354 U.S. 298 (1957) ........................................................................... 39, 40, 41

*Zedner v. United States,*
  547 U.S. 489 (2006) .............................................................................................. 40

## STATUTES

17 C.F.R. § 240.10b-5 ...................................................................................... 41
18 U.S.C. § 1341 .................................................................................... 1, 4, 7, 27
18 U.S.C. § 1343 ........................................................................................ 1, 7, 27
18 U.S.C. § 1346 .......................................................................................... passim
18 U.S.C. § 1348 .......................................................................................... passim
18 U.S.C. § 1349 ........................................................................................ 4, 7, 27
28 U.S.C. § 2255 .......................................................................................... 30, 31

## OTHER AUTHORITIES

1934 Securities and Exchange Act, Section 10(b) ................................................. 6, 9

## Preliminary Statement and Summary of Argument

Last term, in *Skilling v. United States*, 130 S.Ct. 2896 (2010), the Supreme Court held that it violates due process to premise criminal convictions under 18 U.S.C. §§ 1341 and 1343 (and 1348)[1] on the theory that a defendant took "official action" that "furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty," unless the government proves that the defendant schemed to receive or give a bribe or kickback. *Skilling*, 130 S.Ct. at 2932 (citation omitted). The government charged Skilling and his co-conspirators with having "enriched themselves as a result of the[ir] scheme through salary, bonuses, grants of stock and stock options, other profits, and prestige." *See* 130 S.Ct. at 1908. That theory is now invalid.

Bradley Stinn's conviction and sentence were based on the same invalid theory. The government claimed that Stinn "held his own financial interests above those of Friedman's investors," 4697:11-12[2] (or, in the words of *Skilling*, to further "his own undisclosed financial interests," 130 S.Ct. at 2932) and breached his fiduciary duties to obtain "a handsome salary, huge bonuses, tax free stock grants, options to buy more stock," and other employee benefits. 408:9-11.

Specifically, the government condemned Stinn based on alleged causal connections between (a) the company's ambiguous descriptions of its credit-granting practices in SEC reports and Stinn's receipt of a salary, (b) the timing of a write-off of a small amount of accounts receivable and Stinn's one-time $352,000 bonus in 2002, and (c) a description of Friedman's business in a September 2003 prospectus (the "2003 Prospectus") and investors' decisions to hold or buy shares. In *Skilling*, the Court held that such "honest-services convictions" for "schemes of

---

[1]  Section 1348 was not charged in *Skilling*.  As the trial court instructed in this case, sections 1341, 1343, and 1348, and 1349 require the same proof "that there existed a scheme or artifice to defraud any person for the purpose of obtaining money or property by false and fraudulent pretenses, representations or promises," 4402:9-12.

[2]  Transcript references will be referred to by page and line numbers.

1

non-disclosure and concealment of material information" cannot stand where, as here, there is a complete absence of proof that the defendant participated in a bribery or kickback scheme. *Skilling*, 130 S. Ct. at 2932 (quoting *United States v. Mandel*, 591 F.2d 1347, 1361 (4th Cir. 1979)).

Stinn's conviction must be reversed to vindicate the due process concerns underlying the Supreme Court's decision in *Skilling*, namely: (1) that every citizen is entitled to fair notice of the boundaries between criminally proscribed and lawful conduct, and (2) that the law must be sufficiently clear to prevent arbitrary prosecutions by government officials and juries bent on "pursu[ing] their personal predilections." *Skilling*, 130 S. Ct. at 2927-2928, 2933 (citations omitted). *See United States* v. *Matthews*, 787 F.2d 38, 49 (2d Cir. 1986) (criminal liability cannot attach where "a person of ordinary intelligence has not received fair notice that his contemplated conduct is forbidden"). Stinn's twelve-year sentence was based on shifting, ill-defined theories of self-dealing and breaches of fiduciary duty, and it founders on the forbidden "vagueness shoal" identified by the Supreme Court in *Skilling*. 130 S. Ct. at 2907.

It is immaterial that the government and the trial court did not use the phrase "honest services" in the indictment or the jury instructions. The government argued the same invalid theory throughout the trial and relied on the theory to convince the jury to convict Stinn. As the government recognized recently, in successfully arguing to a court of appeals that convictions for bribe and kickback honest services schemes should be affirmed without the "honest services" language in an indictment or jury instructions, it is the substance of the theory rather than the use of magic words that counts. The government's argument and the jury instructions clearly authorized Stinn's conviction for breaching his fiduciary duties without having received a bribe or kickback.

In *Skilling*, the Court remanded to the Fifth Circuit to determine whether the error was harmless and Skilling's convictions could be affirmed on grounds other than the government's honest services claims. The government may not ask

2

for harmless error analysis here, for at least three reasons. First, the government's entire theory was based on the breach of fiduciary duty/dishonest services theory; the government did not proffer any distinct, constitutionally valid, alternate theory. Second, the government chose to incorporate all of its arguments and theories into each of the three counts, so that no transaction or theory could be separately considered by the jury. Having chosen that tactic to commingle facts and theories and thus make it more difficult to determine the basis for any conviction, the government may not now ask to justify the conviction on a subpart of its theory and allegations. Finally, the government successfully opposed Stinn's request for a special verdict that would have required the jury to identify the theory on which it convicted; having chosen that tactic, it may not seek harmless error review now.

### Procedural History

Bradley Stinn served as the Chief Executive Officer of Friedman's Inc., a chain of retail jewelry stores that operated in the southeastern part of the United States. As CEO in fiscal year 2002, Stinn was paid a $550,000 salary, and he received a $352,000 bonus. 451:17-18.

Stinn, one of Friedman's largest shareholders, never sold a single share of Friedman's stock during his eleven years of service as CEO, thus denying himself any profit from his alleged scheme to inflate the stock's value, 4344:12-14 and Dkt #315 at 56 (sentencing memo); Seki Decl. Ex. 1 (Trial Ex. 2, Form 424B5 filed September 19, 2003). The value of his stock holdings far exceeded his salary and bonus.[3]

---

[3] As of September 2003, when Friedman's issued a prospectus, Stinn owned directly 901,192 of Friedman's shares (almost 5% of all outstanding shares and exclusive of thousands of options). If he had sold those shares in the offering, at the offering price of about $15, then he would have received over $13.5 million. Seki Decl. Ex. 1 at S-31. His conduct undermines the claim that Stinn intentionally acted to the shareholders' detriment.

3

Indictment

In December 2007, the government obtained a superseding indictment charging Stinn with mail and securities fraud (18 U.S.C. §§ 1341 and 1348), and conspiracy to commit securities fraud, mail fraud, and wire fraud (18 U.S.C. § 1349). The first 19 pages of the 25 page superseding indictment alleged a variety of improper accounting decisions and misrepresentations or omissions about Friedman's. No single decision, representation, disclosure, or omission formed the basis of any single count; instead, all of the factual allegations are incorporated into each of the three counts. Dkt #122.

The superseding indictment charged Stinn with engaging in a scheme to present a distorted description of: (1) how Friedman's credit program operated; (2) the percentage of customer accounts receivable that were delinquent; and (3) the company's earnings. *Id.* ¶ 17. Specifically, the government alleged that, at a time when Stinn allegedly knew that employees were violating the company's "strict credit application guidelines" by using their discretion to grant credit, he did not disclose Friedman's failure to adhere to its own internal credit guidelines *Id.* ¶¶ 18-20. It also charged that Stinn and others manipulated data regarding the percentage of accounts that were delinquent (including his decision to try to collect $4.8 million of a total of $7.9 million in accounts receivable that had been stuck uncollected in the company's computer system (these accounts were called the "X files")), and that he concealed the existence of the X files from the auditors, shareholders and the public. *Id.* ¶¶ 25-28. According to the government, Stinn directed the company to set its allowance for doubtful accounts at ten percent for the fourth quarters in 2001 and 2002, when he allegedly knew that it should be higher in 2001 for reasons unspecified in the indictment, and when he allegedly knew it should have been higher in 2002 because of the existence of the X files. *Id.* ¶¶ 29-31. Lastly, Stinn purportedly manipulated Friedman's reported

"earnings per share" for fiscal 2002 by writing off the X files too slowly and setting the 2002 fourth quarter bad debt reserve too low. *Id.* ¶¶ 32-41.[4]

While the gist of the indictment was that Friedman's disclosures were materially deficient and its accounting decisions violated generally accepted accounting principles ("GAAP"), the government intentionally never offered any evidence of the alleged "correct" earnings figures, 3584:4-3585:1 ("We don't need actual numbers."), even though it claimed it would prove that Friedman's was "a financial mess," 408:12, and that the complete write-off of the X files in 2002 "would have ravaged earnings," 445:9.[5] The government also never alleged that Stinn received a bribe or a kickback in connection with any of his alleged breaches of duty. It instead claimed that his actions led to compensation for Stinn and the inflation of Friedman's stock price. Dkt #122 ¶ 39-40.

Motion to Dismiss

From the beginning, Stinn argued that the government was impermissibly attempting to hold him criminally liable for undisclosed breaches of fiduciary duty. To that end, Stinn moved to dismiss because the allegations against him did not constitute a crime and violated due process. Dkt #134. He pointed out that the government was essentially charging him with depriving the company of his honest services in an indictment that indisputably never alleged he had schemed to

---

[4] The indictment also alleged that, in fiscal 2003, Stinn participated in an accounting decision regarding a $700,000 tax payment by Friedman's that allegedly resulted in an inflation of the company's earnings for 2003. The government also established at trial, however, that Friedman's never issued audited financial statements for fiscal year 2003. 611:25-612:1; 1809:7-8, 14-15.

[5] The government's "financial mess" fraud theory – a theory claiming Friedman's was a financial disaster, but which omitted any effort to prove the alleged "correct" numbers – permeated the trial and government arguments, *e.g.*, 4119:12-14. *See also United States v. Goyal*, 629 F.3d 912, 915 (9th Cir. 2010) (government failure to offer evidence "to prove that any GAAP violations materially affected the revenue" mandated reversal of 10b-5 convictions).

receive a bribe or kickback. *Id.* at 53. The government never responded to the argument.[6] The court denied the motion to dismiss without discussion. Dkt #122.

The Trial

The trial lasted six weeks, with the government calling ten witnesses (the defense called three). In its opening and closing, the government argued that Stinn was guilty because he had breached his duty of loyalty. *See, e.g.*, 458:22-459:1; 4123:13-25. At the end of the government's case, Stinn moved for judgment of acquittal because the indictment and evidence failed to make out a crime and was improperly based on Stinn's alleged dishonest services. 3575:2-12. Stinn pointed out that not telling Friedman's board about the X files was at most a claim of mismanagement. 3577:23-3578:8. The government conceded that it produced no evidence of what the "true" earnings should have been, but suggested that any difference at all from what was reported constituted a material misstatement. 3584:5-3585:1.[7] The Court denied Stinn's Rule 29 motion.

After five days of contentious jury deliberations, and after a juror who held out for acquittal was dismissed, the jury found Stinn guilty on all three counts. On April 29, 2009, Stinn was sentenced to twelve years in prison.[8] Stinn is currently incarcerated at FCI Herlong in California.

---

[6]  In its opposition to the motion to dismiss, the government claimed it only had to prove the "defendant was responsible for financial reports that intentionally and materially misled investors," citing *United States v. Ebbers*, 458 F.3d 110, 125 (2d Cir. 2006). Dkt 146 at 14 n.3. That argument was misleading because Ebbers was charged with a violation of section 10(b) of the 1934 Securities Exchange Act (and Rule 10b-5), which does not have a "money or property" element like 18 U.S.C. § 1348. It also demonstrates the government's view that a jury could convict based only on proof that Stinn breached his duties (rendered dishonest services) and without proof that he made false statements to obtain money or property.

[7]  The government further conceded that the numbers in the financial statements were correct when John Mauro, Friedman's controller, used a reserve to pay a different debt. 3590:18-3591:7.

[8]  In addition to his prison term, the court ordered Stinn to forfeit $1,019,000, pay $4,393,575 in restitution, and submit to three years' supervised release at the end of his

<u>Direct Appeals</u>

Stinn filed a notice of appeal on May 11, 2009 (over a year before *Skilling* was decided) challenging a conscious-avoidance jury instruction and the dismissal of the holdout juror. The Second Circuit affirmed by summary order on May 26, 2010 (a month before the *Skilling* decision). Stinn's petition for a writ of certiorari was denied by the U.S. Supreme Court on November 29, 2010.

## **Legal Background**

### The Law Before *Skilling*

The federal mail, wire and securities fraud statutes in Title 18 all require the government to prove a scheme to defraud others, through knowingly false or fraudulent representations, of money or property, an intent to defraud, and the necessary connection to a mailing, a wire, or securities. 18 U.S.C. §§ 1341, 1343, 1348, and 1349. *See McNally v. United States*, 483 U.S. 350, 358-359, 365 (1987).

Before 1987, courts authorized schemes to defraud without proof of the element of money or property, but instead with proof that the defendant deprived his employer of the intangible right of honest services. As the Second Circuit explained in *United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003), "honest services" as an intangible rights theory (and in lieu of traditional notions of money or property) included "private actors who abuse fiduciary duties by, for example, taking bribes." *Rybicki* at 133 (quoting *United States v. Handakas*, 286 F.3d 92, 101-02 (2d Cir.), *cert. denied*, 537 U.S. 894 (2002)).

In 1987, the Supreme Court in *McNally* rejected the honest services theory. It held that the fraud statutes did not criminalize schemes "designed to deprive individuals, the people, or the government of intangible rights, such as the right to have public officials perform their duties honestly," 483 U.S. at 358. As *Rybicki* explained, "[u]nder *McNally*, all schemes or artifices to defraud relating to

---

prison term. The forfeiture represented Stinn's salary increase, his 2002 bonus, and the taxes Friedman's paid on his bonus.

7

intangible rights to good government, honest services, privacy – indeed all things other than money or property – were therefore beyond the mail-fraud proscriptions." *Rybicki*, 354 F.3d at 134.

Soon thereafter, Congress passed a statute designed to reinstate the pre-*McNally* honest services doctrine. *Id.* It provided that, for purposes of the Title 18 federal fraud statutes, a scheme to defraud "includes a scheme ... to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. Over the next twenty years, a number of circuit courts upheld the statute, at times by limiting its scope. *See Rybicki*, 354 F.3d at 135 n.7.

*Rybicki*, the controlling Second Circuit decision, held that section 1346 properly reinstated two categories of honest services cases: (1) bribe/kickback cases, where "a defendant who has or seeks some sort of business relationship or transaction with the victim secretly pays the victim's employee (or causes such a payment to be made) in exchange for favored treatment," and (2) self-dealing cases, where "the defendant typically causes his or her employer to do business with a corporation or other enterprise in which the defendant has a secret interest, undisclosed to the employer." *Id.* at 139-40. In the self-dealing context, "the defendant's behavior must ... cause, or at least be capable of causing, some detriment – perhaps some economic or pecuniary detriment – to the employer." *Id.* at 141.

The *Rybicki* majority defined the honest services doctrine for corporate employees as "a scheme or artifice ... to enable an officer or employee of a private entity ... purporting to act for and in the interests of his or her employer ... secretly to act in his or her or the defendant's own interests instead." *Id.* at 141-42 (footnote omitted). In dissent, Chief Judge Jacobs argued that, even as reconstructed by the court, this definition of honest services fraud provided no clear notice to people about what they were prohibited from doing. It was no limit on prosecutorial discretion to require proof that the employee "secretly prefers her own interest to the interest of the employer" because "it is naive to assume that

8

this preference is not the most common premise of private employment." *Id.* at 161. "Every salaried employee can be said to work for her own interest while purporting to act in the interests of the employer. Yet the majority opinion effectively makes 'dishonesty by an employee, standing alone, [ ] a crime.'" *Id.* (quoting *United States v. Frost*, 125 F.3d 346, 368 (6th Cir. 1997)).

Other pre-*McNally* and post-section 1346 case law involving self-dealing or "undisclosed financial conflicts of interest" embraced fact patterns like Stinn's, treating breaches of the duties of loyalty and care as fraud. *See United States v. Skilling*, 554 F.3d 529 (5th Cir. 2009) (where Enron (1) "created a goal of meeting certain earnings projections"; (2) "aligned its interests with Skilling's personal interests, *e.g.*, through his compensation structure, leading Skilling to undertake fraudulent means to achieve the goal"; and (3) "the Board of Directors or any other decisionmaker" did not direct the "improper means" to achieve the goals, Skilling engaged in a scheme to defraud); *United States v. Gray*, 96 F.3d 769, 774-75 (5th Cir. 1996) (employee's breach of duties of honesty or loyalty constitutes a crime when "employee had reason to believe the information [withheld from the employer] would lead a reasonable employer to change its business conduct"; an intent to "help rather than harm" the employer was of no consequence); *United States v. Von Barta*, 635 F.2d 999 (2d Cir. 1980) (defendant committed fraud when he breached his duty of loyalty and honesty to employer when he failed to disclose bond trading by an undercapitalized firm in which he had an interest); *United States v. Kwiat*, 817 F.2d 440 (7th Cir. 1987), *cert. denied*, 484 U.S. 924 (1987) (corporate officer failed to disclose to board that he caused bank to lend money in violation of the bank's by-laws).

The *Skilling* Indictment and Prosecution

In February 2004, the government charged Jeffrey Skilling with conspiracy to commit securities fraud (under Section 10(b) of the 1934 Securities and Exchange Act) and wire fraud, and other substantive counts. That original indictment (like Stinn's) alleged that he was part of a "scheme to defraud" whose

9

participants deceived the investing public, the SEC, credit rating agencies, and others by making Enron's financial results look better than they really were and making false public statements about Enron's actual financial condition and performance. Seki Decl. Ex. 2 (Skilling February Indictment) at ¶¶10 and 11. The government repeatedly stressed the failure of Skilling to act honestly in his dealings with the investing public, the SEC, and Enron. *Id.* at ¶¶ 10, 11, 17, 22, 32, 47, 48, 51-53, 55-57, 59, 63. Skilling and others allegedly "caused entries to be made in Enron's books and records …, which entries improperly released funds from a reserve account solely to ensure that Enron reported a better earnings per share number than Enron actually achieved for the second quarter." *Id* at ¶ 66, sub. ¶ o. When it obtained a superseding indictment, the government did not change its theory or allegations, but simply added the words "honest services" to several counts. Seki Decl. Ex. 3 (Skilling July Indictment) at ¶¶ 87, 92.

In its merits brief in the Supreme Court, the government characterized the facts in virtually the same way as the government characterized the facts in Stinn's case. Skilling was part of a "scheme to deceive Enron and the investing public by manipulating earnings, making false statements to the SEC and the public, concealing losses through sham transactions, and enriching himself in the process." 2010 WL 302206 at *6 (Brief of the United States in *Skilling*). Skilling directed that Enron's "earnings figures be altered after the quarter ended so that the reported numbers would 'beat the street.'" *Id.* at *5. For example, Skilling moved unused reserves relating to particular matters directly into earnings, which Enron's auditors testified was "not a gray area. It's black and white." *Id.* at *5. Skilling resigned in August 2001 and, (in contrast to Stinn) three months before Enron "collapsed in bankruptcy," he sold 500,000 shares of Enron stock. *Id.* at *6.

The government identified the elements of the "paradigmatic offense" that it claimed Congress revived with the passage of section 1346: (1) breach of the

duty of loyalty, undertaken with (2) an intent to deceive, that also is (3) material.[9]
*Id.* at 26. As to the first element, the government argued that "feigned loyalty to
one's principal is a classic form of fraud." *Id.* at 27. For that principle, the
government cited *Rybicki*, 354 F.3d at 151-42 and *McNally*, 483 U.S. at 355. It
cited to the "abundant" number of cases before *McNally* that involved
"undisclosed self-dealing." 2010 WL 302206 at 29 n. 5. It contended that
Skilling's conduct was criminal because he "had, and acted upon, his personal
financial interests, which conflicted with those of the shareholders to whom he
owed a fiduciary duty." 2010 WL 302206 at 32. The government explained its
theory as follows:

> The company and its shareholders attempted to align their long-term
> interests with petitioner's by linking his compensation to stock price.
> But the obvious premise of that arrangement was that petitioner
> would act to maximize shareholder wealth. Petitioner subverted that
> premise, and placed his interests in conflict with that of the
> shareholders, when, for his own financial benefit, he engaged in an
> undisclosed scheme to artificially inflate the stock's price by
> deceiving the shareholders and others about the company's true
> financial condition.

*Id.* Thus, the government's theory was that Skilling had a personal interest in his
salary and bonus (and proceeds from the sale of stock at a high price) and acted in
a way to advance that interest in conflict with his duties to shareholders and the
company. The government pointed out that it had proved Skilling's scheme
resulted in "immense private gain" for Skilling, "through the receipt of salary and
bonuses, which were tied to Enron's stock price, and through the sale of
approximately $200 million in Enron stock, which netted him $89 million." 2010
WL 302206 at *51.

---

[9] In *Stinn*, the government also contended that Stinn breached other fiduciary duties, such
as the duty of honesty. *E.g.*, 1937:10; 2011:3; 2023:14-18; 2075:9-11; 2227:4; 4123:18.

The Supreme Court's *Skilling* Opinion

The Supreme Court rejected the self-dealing theory, and held that "§ 1346 criminalizes *only* the bribe-and-kickback core of the pre-*McNally* case law." 130 S.Ct. at 2931 (emphasis in original). Thus, a corporate executive may not be punished for an alleged "scheme of non-disclosure and concealment of material information" in furtherance of "his own undisclosed financial interests," such as aggrandizing his "salary, bonuses, grants of stock and stock options, other profits, and prestige." *See id.* at 2908, 2932. Criminalizing such conduct beyond its "core" of "bribery and kickback schemes" founders upon "a vagueness shoal" that violates a defendant's right to due process. *Id.* at 2907, 2927-2928.

As an initial matter, the Court observed that the government – invoking language almost identical to that used by the government in Stinn's case – "charged Skilling with conspiring to defraud Enron's shareholders by misrepresenting the company's fiscal health, thereby artificially inflating its stock price." *Id.*; *compare* Stinn Superseding Indictment, ¶ 39-40 (charging Stinn with engaging in fraudulent scheme that led to inflated stock prices for Friedman's). Fatal to the legitimacy of the honest services fraud conviction in *Skilling* was the fact that – just as in Stinn's case – the government "did not, at any time, allege that Skilling solicited or accepted side payments from a third party in exchange for making these misrepresentations." *Skilling*, 130 S.Ct. at 2934. Having found that the criminalization of dishonest services (that is, the breach of fiduciary duty) is unwarranted absent proof of illicit remuneration in the form of a bribe or kickback, the Court held that it "is therefore clear that, as we read § 1346, Skilling did not commit honest-services fraud." *Id.* Hence, "scheming" to improve earnings in order to receive one's salary, bonus, and other employee benefits (that is, "undisclosed financial interests," *id.* at 2932) is not a valid basis for federal prosecution under section 1346 and the body of law it purported to revive.

To the extent that pre-*McNally* and post-section 1346 dishonest services cases did not contain proof of a bribery or kickback, none are good law. One of

the now-rejected cases cited by the government in its *Skilling* merits brief as an example of a judicially authorized honest services prosecution (2010 WL 302206 at *44 n. 5) is particularly instructive here because of its similarity. In *United States v. Siegel*, 717 F.2d 9 (2d Cir. 1983), the government indicted several executives for failing to record a material amount of cash received by a public company and then using that cash for various company expenses and "for their own enrichment." *Id.* at 15. The court held that the defendants defrauded the company's "stockholders by violating their fiduciary duties to act honestly and faithfully in the best interest of the corporation and to account for the sale of all [corporate] property entrusted to them." *Id.* at 13. It affirmed their convictions because the jury could have concluded that the defendants received the cash proceeds and used them "for non-corporate purposes in breach of their fiduciary duties to act in the best interest of the corporation and to disclose material information" to the company and its stockholders. *Id.*

In dissent, Judge Winter argued for the limitation later embraced in *Skilling*. He reasoned that the prosecution was made out "solely by a showing of improper corporate record keeping," *id.* at 23, noted that the federal fraud statutes were never intended to enforce fiduciary duties, and yet the majority read the fraud statutes "to embody a federal law of fiduciary obligations." *Id.* at 23-24. *Siegel* did not involve a bribe or kickback and thus, like every one of the cases cited by the government in *Skilling*, its theory of prosecution now falls outside the scope of the fraud statutes.

## The Stinn Trial Evidence of Dishonest Services

During Stinn's trial, the government presented a constitutionally defective dishonest services scheme: **First**, it claimed Stinn violated his fiduciary duties to Friedman's by operating its credit program in a manner inconsistent with Friedman's public disclosures while Stinn received a "handsome" salary. This is the "salary theory." **Second**, it contended that Stinn violated his fiduciary duties when he directed that company employees set up a reserve to cover the impact to

13

earnings of the X files, as estimated by the CFO and the head of credit (see fn 20, *infra*, and accompanying text) and then tried to collect the X files. That decision allegedly inflated Friedman's fiscal 2002 earnings in an unspecified way and earned Stinn a $352,000 bonus for 2002. This was the "bonus theory" of fraud. **Finally**, the government argued the "right to control" theory: Stinn breached his duty to shareholders by failing to provide "guidance and truth" while he was the "custodian of their money." 4202:3-4.

Each of these three theories raises the questions that, for the *Skilling* Court, demonstrate why the corporate self-dealing theory failed for vagueness: "How direct or significant does the conflicting financial interest have to be? To what extent does the official action have to further that interest in order to amount to fraud? To whom should the disclosure be made and what information should it convey?" *Skilling*, 130 S. Ct. at 2933. The government never answered these questions for its theories of Stinn's guilt. Instead, any conflict, and any non-disclosure, formed the basis for the government's argument that Stinn lied and should be convicted.[10]

Moreover, these three theories were intertwined in the indictment, as well as in the government's evidence and arguments, and in the jury instructions. It is impossible to tell which theory formed the basis of the jury's verdict. In addition, the government's evidence of a discrepancy between Friedman's disclosures regarding its credit business and how that business actually operated was thin, and the government failed to offer even estimates of what the "true" earnings should have been. Conviction thus depended on the jury adopting the government's reading of isolated phrases in public disclosure documents and on its conclusion

---

[10]   For all of its references to "duties" that Stinn owed, and its expert testimony about fiduciary duties from a New York law school teacher, the government never offered evidence of which state's laws created those duties and what those duties required in each instance where Stinn was accused of having failed to act properly.

that *any* deviation from the "correct" method of operation or earnings was criminal.

### The Government's Salary Theory

In its opening statement, the government argued that Stinn breached his fiduciary duties so that he would be "paid handsomely":

- "[T]he defendant told lie after lie, to prop up the value of Friedman's stock while allowing himself **to make a boatload of money**." 408:20-22.

- "You will hear that the defendant willingly **embraced his obligations** to the investing public and that **he was paid handsomely to take on that duty and that responsibility**. In 2003 alone, the defendant's salary at Friedman's was eight-hundred-fifty-thousand-dollars a year ....a fat pay check to honor his duties and responsibilities to his shareholders." 416:7-15.

- "[B]ecause of his success in 2002, **[Stinn] got himself a $350,000 raise**, so he would make $850,000 as Chief Executive Officer for Friedman's in 2003." 451:24-452:1.

- "The investors had a right to trust this Chief Executive Officer, the defendant. ... **[Stinn]**, as I've shown you, **was paid handsomely to honor those rights** and to vigilantly protect the interests of the investors." 458:11-20.

The government repeatedly stressed Stinn's breach of his duty of loyalty. It argued that Stinn "sits in this courtroom" for breaching his fiduciary duties by failing to describe the way Friedman's granted credit and collected on debt, and by using accounting manipulations, so that he could "pad his own pockets with a handsome salary, huge bonuses, tax free stock grants, options to buy more stock, car allowances and housing allowances." 408:4, 8-11; *see* 408:4-24; 416:7-15. By the end of the government's opening statement, it was clear to the jury that the government believed Stinn was guilty because he undertook fiduciary duties and collected a salary from a company that failed to disclose its credit operations sufficiently.

Consistent with the approach it used in *Skilling*, the government established through its first witness that Stinn's conduct was to be judged by fiduciary duty standards – in other words, that Stinn's crime was acting disloyally or without the requisite care while on the company's payroll. Eric Pan, an associate professor of law at Cardozo Law School, explained the standards of care and loyalty, 531:21-532:16. He told the jury that (1) Stinn owed a "duty of loyalty" to shareholders, 532:5; (2) Stinn was not allowed to buy himself "a brand new car using company funds because that is money that should belong to the shareholders," 532:8-10; (3) Stinn was responsible for all "the information that we require to be sent out to the public to potential investors," 532:9-11; 533:9-11; (4) Stinn was not allowed to "back[] into a number" on the financial statements, 560:23-561:6[11]; and (5) Stinn was "ultimately in charge of everybody in the company," 585:15-20.

A large part of the government's case was then devoted to proving violations of these duties through proof that Friedman's operated its credit program differently from the way it was described in its public statements. Stinn's scheme, according to the government, was to earn his salary while failing to correct the discrepancies between disclosure and operation. But even with the, at most, marginal evidence of such discrepancies, there was no allegation or evidence that Stinn took a bribe or kickback for allowing Friedman's to operate this way.

As to credit granting, Friedman's 2002 Form 10K said that (1) Friedman's targeted "low to middle income consumers," (2) it offered a "proprietary credit program to help customers finance their purchases," (3) each store operated under a store partner responsible for "credit extension and collection," and (4) each store had access to "credit bureau reports and process credit applications." Seki Decl.

---

[11] The government did not call an accounting expert for any proposition, including the claim that a company may not make business decisions to try to meet financial goals it set for itself, but instead relied on its law professor to give that opinion. The government then argued to the jury that "backing into" an earnings goal is "like fixing a sporting event," a "totally impermissible form of accounting," 441:8, 11, and thus a crime.

Ex. 4 (Trial Ex. 16), 2002 10K at 2, 4-5. In its 2000 Annual Report to Shareholders, Friedman's explained that "[e]ach Store Partner manages ... credit extension and collection .... We give Store Partners great latitude to make immediate, discretionary decisions that respond to the needs and wishes of their customers." Seki Decl. Ex. 5 (Trial Ex. 4045) (2000 Annual Report) at 7.

Despite the public disclosures about discretionary credit decisions, the government contended that Stinn committed fraud because Friedman's also said it "adhere[d] to strict credit application guidelines in determining whether our customers qualify for credit" in the Risk Factors section of its Form 10K. Seki Decl. Ex. 4 at 24. According to the government, Friedman's statements "about the strict operation of its credit granting policies and procedures were false and misleading [because] employees . . . routinely extended credit to customers in violation of the Company's guidelines." (Dkt #122 ¶ 18) [12] According to the prosecution, Stinn was obligated to disclose more about credit granting practices at the company. *E.g.,* 423:9-12; 455:4-7; 983:7-16; 984:16-17; 4133:11-4134:16; 4136:3-12.

The government then sought to establish that Stinn breached his fiduciary duties through testimony that Friedman's credit sales violated the company's "strict" credit granting policy. For example, it elicited testimony that (1) Friedman's violated the guidelines between 5% and 10% of the time it granted credit, 2774:3-20; (2) Milligan, the credit manager, thought the company's older receivables were "excessive" and granting credit outside internal guidelines was

---

[12] The government and Stinn disagreed over the significance and meaning of "strict credit application guidelines." The government claimed this phrase "was a bald face[d] lie," 423:9-12, while Stinn pointed out that the phrase appeared in one place in the Risk Factors describing the risks of Friedman's credit business, and the phrase itself referred to the fact that Friedman's used a uniform credit application, *e.g.,* 473:15-16; 475:22-476:18; 834:11-835:12; 3281:15-24; 3628:2-18. An outside stock analyst understood that there was a single credit application, that every credit customer was required to complete it, and there was only one way to fill it out, 3275:22-3276:10. A store manager also explained the standard credit application process, 3783:23-3784:22.

"ludicrous," 2777:21-2778:11; 2825:24-2826:3; and (3) sales managers encouraged sales people to talk to the managers before turning customers away and expressed that sentiment with the expression "no one [customer] walks until the big dog [sales manager] talks," 2817:13-2818:11.[13] *See* 2823:16-2824:8 (loosening up credit as a violation of credit policy); 2825:21-2826:3; 2832:9-11; 2834:24-2835:1 (managers' authorizing credit sales as inconsistent with Friedman's guideline); 2847:4-17 (Milligan claiming that sales authorized by store managers violated the company's credit guidelines); 648:23-25 ("we would want to be extending credit to anybody that we could extend credit to, to increase our sales"); 732:11-17 ("by offering them a Friedman's account, they could charge much more than what they probably would normally be able to afford").

The evidence showed an at best ambiguous discrepancy between the disclosed credit granting policy and the actual credit business operation. While Milligan's opinion was that Friedman's should grant credit more strictly, he also testified that it was granted conservatively. For example, he said that his verified computer analyses, 2975:2-16; 2999:21-3000:11, demonstrated that Friedman's credit granting was tight, rather than loose. 2758:12-2759:7 (description of New Account Analysis ("NAA")); 3808:22-3810:24 (NAA part of credit disciplines); 2759:5-8; 2983:13-16. NAA scores above ten percent meant credit was loose; scores below eight percent meant it was tight, 2836:11. *See* 2836:8 (between eight and ten percent means credit granting is neither too conservative nor too aggressive); 2983:2-2984:18 (score should not be too low or too high). Friedman's NAA score was close to eight percent during the charged period. *E.g.*, Seki Decl. Ex. 6 (Trial Ex. 649, Operations Report of September 2002 at FC 18

---

[13] Consistent with Pan's testimony that Stinn was responsible for everything at the company, the government offered evidence of the way salesmen talked to each other about making sales in e-mails such as the one quoted in the text. The head of credit did not testify that Stinn knew about the aggressive sales talk. The government also asked Louise Stokum (an employee in the accounting department) about emails by sales managers that used the phrase "nobody walks until the big dog talks," 649:10-11; 649:22-24.

11157); 2836:8-11; 2982:23-2985:9; see 1662:7-1662:23; 1120:25-1122:7; 3062:4-13 (2002 was 7.23 percent); 1779:22-1779:24 (NAA "trending down" in 2003).

As to credit collections, the government offered evidence to prove that Friedman's (and Stinn) did not enforce, to the day, a policy of "generally" writing-off accounts when they became 120 days past due.[14] 2393:10-17; 2853:20-2854:5. This practice allegedly violated GAAP.[15] The government claimed that Friedman's end-of-the-month collection effort was inconsistent with the disclosures and distorted one statistic included in Friedman's SEC reports – the percentage of accounts receivable that were deemed current versus the percentage that were delinquent. 3084:23–3085:1. The government suggested Friedman's was instead required to write-off overdue accounts precisely on the day they reached 120 days old, 2388:12-25.[16]

A significant part of the government's case thus rested on ambiguous disclosures about the "strictness" of credit granting and the precision of account write-offs. The government then constructed an argument that Stinn breached his duty of loyalty by supposedly telling the public inaccurately that the company

---

[14] The company reported in its Form 10K that it "generally" wrote-off "credit accounts receivable if no payments have been received for 120 days," *and* "if judged uncollectible." Seki Decl. Ex. 4 at 5. It was undisputed that Friedman's tried to collect 120 day old accounts for a week or two at the end of each month or quarter.

[15] GAAP was a foundation of the government's indictment, which alleged that GAAP required Friedman's to record credit sales and write-offs, Dkt #122 ¶10, to estimate the accounts receivable that were expected to be uncollectible, *id.* ¶14, and to subtract the bad debt reserve from earnings, *id.* ¶¶15 and 38. The government did not call an accounting expert on GAAP. Its lawyer expert (Pan) gave a broad explanation of GAAP and its importance to a company's financial statements, 544:3-545:16, and what must be disclosed about a write-off policy, 915:20-916:6. CFO Suglia (not testifying as an expert) testified that his change to the reserve was inconsistent with GAAP, 1422:20-1423:16, and he wrote off accounts in a way that was inconsistent with GAAP, 1428:25-1429:3.

[16] Accepting payments on accounts after the end of a month or quarter was not a violation of GAAP because collectible accounts may not be written off, 892:12-22; 895:11-24; 896:7-11; *see* Dkt #325, McGrath Declaration at 5-8.

19

granted credit strictly in accord with certain guidelines and wrote off accounts on the 120th day after the last payment[17] while drawing his "handsome" salary.

The government also proved that Friedman's estimate for bad debt write-offs at the end of each year was set at ten percent, and Suglia, the company CFO, testified he manipulated his calculations to reach the ten percent, 1350:24-1351:14; 1355:9-25. There was no dispute that Friedman's reported publicly that its bad debt reserve was set at ten percent in the fourth quarter of most years, Seki Decl. Ex. 4 at 6, and that Friedman's reported its actual write-offs accurately each year in the line directly above the allowance, id.; see 2294:2-13; 3277:8-23; 3482:6-9; 2578:12-21. The government never offered any testimony from the outside auditors that this was wrong.[18]  Dkt #315 (Sentencing Memo) at 41-42, Exs. 4 and 5.

As with credit sales and collections, the government's evidence about the ten percent bad debt reserve was ambiguous. The government argued throughout the trial that Stinn was responsible for a fourth quarter bad debt reserve that was "ridiculously low," 4184:8, 1350:24-1351:14; 1355:11-21, but the government objected when Stinn sought to show that a retrospective change in the reserve would not have a material impact on prior reported earnings. For example, at the government's request, the court limited questioning of Friedman's controller about

---

[17]  The government argued that, "Mr. Stinn goes on and on [during an analyst conference call] about how tight they are with credit and how this 120 day policy is very, very strict that's why the investors can have such confidence in the receivables that are presented on the balance sheet," 4129:22-24. The government referred to an April 25, 2001 conference call reflected in a 77-page transcript, in which Stinn said (in response to a question about the consumer market), "If they don't pay us, we charge them off pretty quickly; a hundred and twenty days." Seki Decl Ex. 8 (Ex. 37) at 64. No one on that call asked any questions about the date of write-off or the precision of the date.

[18]  See SEC v. Guenthner, 395 F. Supp. 2d 835, 847 (D. Neb. 2005) (rejecting the SEC's invitation to interpret GAAP without expert assistance in a civil enforcement action); Danis v. USN Commc'ns, Inc., 121 F. Supp. 2d 1183, 1191-1192 (N.D. Ill. 2000) ("[v]iolations of GAAP ... are established through expert testimony" and the plaintiffs had provided no expert evidence of "material GAAP ... violations").

the subject, 2637:2-2648:24, and restricted Stinn's ability to call a defense witness who would have explained that a retrospective change in the fourth quarter reserve from 10 percent to 14 or 17 percent would have had a minimal impact on earnings, 3318:12-3328:20; 3554:17-3561:13. Even the prosecutor conceded – in a colloquy with the Court – that an SEC accountant told him earnings would be unaffected by a retrospective change in the reserve. 2654:4-10. The government did not dispute the accuracy of this analysis. Dkt. #330.

Stinn's alleged "scheme" thus fell far outside the bribery and kickback category of cases established by the Supreme Court. Instead, for credit sales and collections, the SEC disclosures at least arguably described how Friedman's operated accurately; everyone at the company knew how and when credit sales and collections were made, 3824:4-25; the bank auditor understood how payments on accounts were treated, 1171:17-20; no one from Friedman's outside accounting firm testified that it was misled about credit granting and collections; a director testified that the outside accountants concurred with trying to collect on delinquent accounts, 3454:14-3455:6; the customers obviously knew how the system operated; and a stock market analyst testified he did not know aspects of the operation, but admitted he misread the disclosures, 3272:16-3274:6; 3274:10-3275:20; 3275:24-3276:10; 3283:7-24; 3286:19-3287:7. For the fourth quarter estimates of potential future write-offs of credit accounts, the ten percent estimate and the actual, final percentage of write-offs were disclosed clearly in a box prominently displayed in the Form 10-K, Seki Decl. Ex. 4 at 6.

In sum, the jury was asked to convict Stinn as criminally disloyal to Friedman's board and shareholders because Friedman's operated its credit business differently from the government's construction of the SEC disclosures, Stinn was responsible for everything at the company, he failed to correct a "false image" the company presented to the public, 456:11; 685:8-11, and he was paid "handsomely." *See* 416:9; 1401:20-25; 1402:6-9, 17-19; 1437:23-1438:2; 2412:12-2413:3. The government stressed Stinn's compensation, offering

evidence that he received a $550,000 salary, a $100,000 salary increase and options to purchase 100,000 shares for 2002, 451:17-452:1; 1954:13-1955:11; 1956:10-23; 1966:4; 3395:11[19]; a $42,000 housing allowance, a $17,919 automobile allowance, forgiveness of interest of $105,000 over three years, and a reimbursement of taxes, 1966:23-24.  The government elicited testimony and other evidence about Stinn's salary and its increases numerous times during the trial, *e.g.*, 416:7-12; 1956:13-21; 1960:16-1961:25; 1965:3-1966:8; 1967:17-1968:1; 2401:15-2402:11 (contrasting Stinn's salary with the Controller's salary); 2186:1-15 (Stinn not required to return any of his salary despite cash flow problems).  The trial court admitted the evidence because "[i]f the company was not performing as the financials suggested, then Stinn wouldn't have gotten the same compensation, whether or not Mr. Stinn was responsible for the overstatement of earnings." 2068:16-19; 2073:10-2075:6 (director testified he would have wanted to know about a particular transaction in connection with setting Stinn's salary).

Government's Closing Argument on the Salary Theory:  The government stressed its salary theory in closing:

> "As a result of the lies the defendant told, **he got an ever-increasing salary and an ever more generous compensation package of bonuses, interest free loans, tax free restricted stock, a housing allowance and a car allowance**. The victims, the people he lied to and stole from, were the shareholders.  And believing his lies, **the shareholders compensated the defendant well** to become the guardian of their investments.  **They rewarded him** because of the immense responsibility he undertook.  And **in return, they had every right to expect that he would fulfill his duties, duties like the duty of honesty to tell the truth** about the inner workings of Friedman's, duties **like the duty of transparency** of corporate affairs, duty like the **duty of loyalty** to put the shareholders interests above his own

---

[19]  Even in this context, the government's proof was ambiguous at best – thus again demonstrating why it is unconstitutional to convict an executive of fraud for simply breaching a fiduciary duty.  Stinn's 2003 salary increase was, in fact, premised on an executive compensation peer review that also took into account his separate salary from an affiliated company, 4688:18-4690:5, and was not based on reaching particular earnings targets.  4713:23-4718:17.

every day of every week.  The defendant owed that duty to every
shareholder...."

4123:8-25.  The government thus opened and closed with the argument that Stinn
breached his fiduciary duties and "proved" that he earned a salary in the course of
his conduct.

### The Government's Bonus Theory

The government also contended that Stinn breached his fiduciary duty in
order to receive a bonus for fiscal year 2002.  The bonus theory suffers from the
same defects as the salary theory because it authorizes a jury to convict a corporate
employee for breaching his duties without proof that he received a bribe or
kickback.  The theory as applied to Stinn suffers from the additional defect that
there was no connection between Stinn's allegedly fraudulent act and his bonus; in
fact, Stinn *cancelled* executives' bonuses (including his own) the same year that
he purportedly engaged in fraud.

The government argued that Stinn's 2002 bonus was contingent on
Friedman's reaching a particular earnings number.  450:20-24; 1951:7-11;
1955:24-1956:1; 1957:6-9; 3396:22-3397:15.  It then claimed that Stinn received a
$352,000 bonus because all of the X files were not written-off in fiscal 2002,
451:18-20; 1335:12-1336:3.  Stinn would have received no bonus "absent the
manipulation" to the financial statements about which Suglia testified, according
to the government.  1400:1-10.[20]

The "X files" were $7.9 million of accounts receivable that Friedman's had
inadvertently failed to collect because of a computer glitch, 2370:2-2372:4;
2529:22-25.  Milligan caused the glitch by manipulating data (which he hid from
Stinn).  2899:22-2900:7.  When Stinn learned about the problem, he directed that a

---

[20]   Friedman's paid taxes on Stinn's bonus and the government then sought to "prove"
that the tax payment was not disclosed in the September 2003 prospectus, 1967:1-6.  But
its witness made clear that compensation paid in 2003 (including the bonus and tax
payment) would be reported in the 2004 proxy statement, 2034:8-18, which should have
been issued some time in 2004.

reserve be set up for the X files, 1902:17-1903:2,[21] and significant efforts to collect the accounts were made, 2907:10-2910:7; 2913:8-2914:1; 2916:14-2918:19; 2927:22-2928:20.  The Friedman's policy was not to write-off accounts over 120 days unless they were "judged uncollectible," *see* fn 14 above.  Thus, trying to collect the account was consistent with the policy.

The X files were an immaterial part of Friedman's business, 2925:4-21,[22] and the government never presented evidence of the change in 2002 earnings if the portion of the X files written-off in the first quarter of 2003 had been written off in the fourth quarter of 2002.  Instead, the government offered testimony that one former director believed Stinn was required to tell the Board about the X files (without any expert testimony or other proof that a particular SEC rule or state fiduciary duties required him to do so).  3386:18-3387:22.  It also claimed Stinn was required to tell the public about the X files, 2384:14-17.

While the government contended that Stinn was paid a bonus because $3.4 million of the X files were not written-off until early fiscal 2003, its witnesses testified that Stinn's 2002 bonus was not actually based on Friedman's treatment of the X files.[23]  The government witnesses testified that Stinn cancelled executive bonuses when the X files were discovered so that money set aside for the bonuses

---

[21] 1885:24-1887:3 (Victor Suglia, Friedman's Chief Financial Officer, testified that he predicted a $2.8 million earnings impact from the X files, which was reduced to $2 million because of existing reserves); 1902:17-1903:2 (Stinn told Suglia to set up a reserve for the X files); 2567:1-8 (Mauro testified the prediction was that the X files would have a $2.8 million impact on the financials, and that formed the basis for the reserve that was set up); *see generally,* 4264:13-4273:6 (marshaling of evidence concerning X files, including $2.8 million reserve).

[22] Milligan agreed with the head of business operations that the X files had a 0.1% impact on 2002 "collection percentage."  2924:10-2925:21 and Ex. 4032.

[23] Stinn said "the evidence would show for 2002 ... that, regardless of how the X-Files were treated, the company did not meet its earnings target. Mr. Stinn and the other executives did not earn a bonus; that the bonus was only earned when there was a refund—a rebate paid." 240:1-5.  That is what the evidence showed. 2666:22-2667:21. The government created a false impression by eliciting a false statement that bonuses would not have been paid without the "manipulations," 1552:6-18.

could be used for a reserve to cover the X files. 1907:15-1908:15; Ex. 824; 4703:5-12. The only reason financial targets for bonuses were met for 2002 was because Friedman's received a $1.7 million rebate of a previously paid foreign tariff, 2666:13-2667:8; 2693:21-24. That is the money that was used to pay the bonus for 2002, 2667:13-21; 4320:1-11; 4699:10-17; 4701:12-4703:19.[24]

## The Government's Right to Control Money Theory

The government finally contended that Stinn was guilty of fraud because Friedman's investors were deprived of their right to control the company's money. *See* Dkt. #222 at 12 (citing to *United States v. Wallach*, 935 F.2d 445, 462-63 (2d Cir. 1991)). This contention evolved into two different arguments: (1) Stinn violated his duty to existing shareholders who had "entrusted him with their hard-earned money," 458:24; or (2) Stinn violated his duty to new investors in Friedman's stock based on the 2003 Prospectus, which was "rife" with false statements, 3582:10-11 (though the government did not offer any proof of what the correct numbers should have been in that prospectus).

In its opening, the government characterized its theories relating to existing investors as contingent on proof that Stinn breached his fiduciary duties to them:

- **"The investors had a right to trust this Chief Executive Officer,** the defendant. **They had the right and they demanded the truth from the defendant about what was really going on at Friedman's.** They had the right to have their interests put first every single day of every single week. These were their rights, and the duty of Chief Executive Officer was a duty that was taken on willingly and voluntarily by this defendant, and he, as I've shown you, was paid handsomely to honor those rights and to vigilantly protect the interests of the investors." 458:11-20

---

[24]  Mauro reversed a reserve that had been created to pay potential bonuses when Stinn cancelled the executives' 2002 bonuses, 1907:15-1908:15, and used that reserve to pay for increased charge-offs, 2410:9-16. Then, after Friedman's received an unexpected rebate, 2666:22-2667:21, and was able to pay bonuses, Mauro paid the taxes due on the bonuses with an unused reserve set up for a different purpose. That, according to Mauro, was not "proper accounting." 2415:6-14; 2416:24-2417:4.

- **"He violated the duty of loyalty to the investors.** He violated the duty of trust he had to investors as they entrusted him with their hard-earned money. **He violated all of that by telling lie after lie** about the financial condition of Friedman's. He violated all of that." 458:22-459:1.

In support of the argument that Stinn failed to provide sufficient "guidance" to current investors, the government offered testimony of a shareholder, Nesbitt, that "the company could have done a better job of informing us what the magnitude of the problem was," 2226:13-14; that Nesbitt would have wanted to know if "the Friedman's stores were violating the strict credit policies," 2233:14-16, if Friedman's used a "preselected a figure for the allowance that they backed into," 2234:23-2235:6, or if Friedman's tried to collect on accounts after the end of a quarter, 2255:16-22. He also opined that "the 120 day write-off policy" was "pretty liberal," 2235:22-2236:5, and that Stinn should have disclosed the X files during an analyst conference call, 2254:11-22.[25]

In support of its alternative claim that people bought Friedman's stock based on false statements in the SEC filings, the government called Jeffrey Stein, a stock market analyst who covered Friedman's stock for a period of time, to testify that he thought Stinn and Suglia misled him.

Stein claimed that Stinn told him that there were "consistent guidelines applied across the chain in terms of how credit is approved," 3144:1-14. He said that no one told him that credit sales fell outside the bounds of the company's

"strict guidelines," and that "would have been troubling," 3160:6-22.[26] Stein also said he was not told that Friedman's tried to collect accounts after the end of a quarter, 3200:2-15. Stein testified the "false" information "inhibited" his ability to make accurate projections, which could have impacted shareholders' knowledge. 3187:3-12. On the other hand, Stein admitted that, when he wrote his first analyst report, he misstated Friedman's public disclosures about credit granting guidelines and the "strict credit application," as well as the fact that accounts were "generally" written-off when there had been no payments for 120 days, 3274:10-3276:10.

In its closing, the government argued its first theory of the "right to control" by claiming Stinn failed to provide "guidance and truth" while he was the "custodian of their money." 4204:3-4. It also argued, as to its second theory, that Stinn was "a guy who using a prospectus filled with lies got brokers and shareholders from Brooklyn, from Long Island and from all over the United States to give over $45 million of their hard earned money to Friedman's in September 2003 to pad his wallet and to finance his dreams of success." 4350:22-4351:2.

## The Jury Instructions and Verdict Form

In discussing proposed jury instructions, the government contended that the money or property element of sections 1341, 1343, 1348 and 1349 of Title 18 could be satisfied by "getting salary from the company or having the shareholders buy stock based on false representation," 844:10-12, or having the "goal" of obtaining money "from a corporation or the goal could be to have people invest."

---

[26] The government misled the jury about Friedman's credit exception rate, and sought to use its own inflated calculation of the exception rate as an example of Friedman's violation of its credit policy. The rate at which employees granted credit outside the credit guidelines was about 1% overall. Exception rates for sales over $3000 (a minority of sales, *e.g.*, 3615:6-12; 3766:23-3767:1; 3772:11-15) were higher. *See* 3942:3-3949:3; *see also* 1692:4-1700:23, and Ex. 858 (proving the true exception rates); 3918:16-3932:6 (describing expert analysis of exception rates). The government used the $3000 credit sale exception rate as though it reflected company-wide statistics and contended this proved widespread credit granting in violation of internal guidelines.

848:2-3. The government theorized that Stinn did not honestly earn his salary or his 2002 bonus of $352,00, 451:17-20; 574:16; 854:8-13; 1400:7-10; 2159:1-4; 2400:10-11. Stinn objected to the government's reliance on compensation and a bonus to prove its case. 239:1-4; 240:13-16 ("We object to any evidence about Mr. Stinn's compensation or bonus in the case."… "The argument that the government is making essentially elevates compensation and bonus to fraud.").

The court adopted the government's proposed theories, including its right to control theory: "it's securit[ies] fraud as well under the rights of control in the cases which provide the shareholders, the owners of the company are entitled to control as to what happens to their property. One of the things that happens to their property, if you give it away improperly based on fraud, their rights to control their assets and that of the company has been implicated." 4042:11-18.

The court instructed the jury that it could find Stinn guilty if he intended to harm the "property rights" of another – either that he lied to obtain compensation or if he sought to have potential investors "make investment decisions" (thus encompassing both versions of the "right to control" argument) based on false statements:

> The government must prove beyond a reasonable doubt that the scheme to defraud contemplated or intended some harm to property rights of another. This requirement is satisfied if you find either that the government proved beyond a reasonable doubt that the defendant planned to obtain or actually obtained money from Friedman's by materially fraudulent representations or that the defendant intended that other individuals would make investment decisions as to Friedman's shares based on materially fraudulent representations.

4405:15-24.

With respect to the verdict form, Stinn asked the court to instruct the jury that it had to be unanimous about which property right "is being purportedly taken," rather than simply saying it could be either "Friedman's property right or

28

some shareholder's property right," 4042:21-25. The judge responded that, if there are two theories advanced by the government and one turns out to be wrong, then the valid theory "still sustains a conviction," 4043:5-10.

Stinn also asked that the jury be required to identify through a special verdict the property or the theory that it found was part of the scheme. 842:6-18; 4083:4-22; Dkt. #271 (letter dated March 8, 2008). The court advised the jury that it must be unanimous on one theory, 4406:1-8, but after the government objected, the court denied Stinn's request that it identify the theory, 4091:18-4092:16. With a general verdict, it is impossible to know which theory the jury chose.

## ARGUMENT

## STINN'S CONVICTION AND SENTENCING MUST BE VACATED

Stinn's conviction is the result of a government "enterprise of criminalizing undisclosed self-dealing by . . . a private employee." *Skilling*, 130 S.Ct. at 2933 n.44. The Supreme Court drew no distinction between salary and bonus as an improper basis for a conviction based on alleged violations of fiduciary duties. And the right of control theory as expressed in *Wallach* (the case cited by the government in its jury instruction request letter, Dkt #222) was based on caselaw expressly rejected by *Skilling*, and it suffers from the same defect, authorizing convictions for any flawed business conduct. If any one theory were conceivably valid, however, Stinn's convictions still cannot stand because all theories were mixed together in all three charges, without differentiation, and the court denied Stinn's request that the jury tell him what it concluded he did wrong. Because Stinn has been punished for conduct that the Supreme Court has unequivocally held is lacking in "standards of sufficient definiteness and specificity to overcome due process concerns," this Court must grant Stinn's motion to vacate and reverse his convictions. *Id.*

# I. *SKILLING* APPLIES TO THIS MOTION UNDER 28 U.S.C. § 2255.

28 U.S.C. § 2255 ("Section 2255") provides that a prisoner in custody under sentence of a federal court may move "to vacate, set aside or correct the sentence" if that sentence was imposed in violation of the Constitution or the laws of the United States. If the court finds any of the grounds present, then "the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255. Relief under Section 2255 is available for constitutional errors. *Cuoco v. United States*, 208 F.3d 27, 30 (2d Cir. 2000).

*Skilling* applies retroactively to motions brought under Section 2255 challenging convictions that became final prior to the Supreme Court's June 2010 ruling. "New *substantive* rules generally apply retroactively [to cases on habeas review]. This includes decisions that narrow the scope of a criminal statute by interpreting its terms." *Schriro v. Summerlin*, 542 U.S. 348, 351-52 (2004) (emphasis in original). "The [Supreme] Court has emphasized that 'full retroactivity [is] a necessary adjunct to a ruling that a trial court lacked authority to convict or punish a criminal defendant in the first place.'" *Ingber v. Enzor*, 841 F.2d 450, 453-54 (2d Cir. 1988) (quoting *United States v. Johnson*, 457 U.S. 537, 550 (1982)).

*Skilling* "narrow[ed] the scope" of the mail, wire, and securities fraud statutes by limiting the use of "dishonest services" as a way to prove a scheme to defraud and by excluding breaches of fiduciary duty as a substitute for proving that a defendant obtained money or property as a result of his alleged scheme. *Skilling*, 130 S.Ct at 2931. Because the decision in *Skilling* "[explains] its understanding of what the statute has meant continuously since the date when it became law," *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 313 n. 12 (1994), *Skilling* must apply retroactively to authorize challenges to criminal convictions based on the theory that *Skilling* rejected including cases on habeas review. *See*

*Stayton v. United States*, Nos. 09 Civ. 157, 09 Civ. 209, --- F. Supp. 2d ----, 2011 WL 691238 (M.D. Ala. Feb. 28, 2011); *Geddings v. United States,* No. 5:08-CV-425, 2010 WL 2639920 (E.D.N.C. June 29, 2010) (releasing prisoner pending resolution of habeas proceedings in light of likelihood of success on the merits after *Skilling*).

## II. STINN HAS NOT WAIVED A *SKILLING* ARGUMENT

It is no bar that Stinn did not challenge his conviction on honest-services grounds on direct appeal. Stinn argued before trial that the indictment and charges were defective because they did not state a crime, were based on misreading ambiguous phrases in the SEC reports, and violated due process. *See, e.g.*, Dkt. #134 at 14-51. His decision to raise different errors on appeal does not foreclose a Section 2255 motion based on *Skilling*. Stinn need not show cause for his decision, on direct appeal, to await the *Skilling* decision before he pressed his preserved claim further. *See Davis v. United States*, 417 U.S. 333, 336 (1974); *Triestman v. United States*, 124 F.3d 361, 368 n. 7 (2d Cir. 1997).

Even were it necessary to show cause for not pursuing an appeal on the honest services issue, Stinn could do so, given that the law adverse to him was settled at the time of his appeal. *See, e.g., Lomelo v. United States*, 891 F.2d 1512, 1515 (11th Cir. 1990); *Underwood v. United States*, 15 F.3d 16, 18 (2d Cir. 1993); *Reed v. Ross*, 468 U.S. 1, 14 (1984). The self-dealing honest services theory was "expressly approved" by the Second Circuit in *United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003). No circuit had limited the theory to bribes and kickbacks. The Supreme Court had denied certiorari on the issue. *Sorich v. United States*, 129 S.Ct. 1308 (2009) (denying petition for certiorari to challenge to §1346 as void for vagueness in February 2009 – eight months before Stinn filed his appeal brief).

## III. *SKILLING* MANDATES THAT STINN'S CONVICTION BE VACATED BECAUSE THE JURY WAS AUTHORIZED TO CONVICT ON THE SALARY THEORY

A. The Salary Theory Was Expressly Rejected by the Supreme Court

The government's salary theory – that an employee who breaches his fiduciary duty and collects a salary may be found guilty of mail, wire, and securities fraud – was expressly rejected by the Supreme Court in *Skilling*. The government made the exact same arguments about Skilling's and Stinn's conduct (except that, unlike Skilling, Stinn did not sell his shares at any time during the alleged scheme, and the government did not contend that he did). Moreover, "salary" cannot satisfy the money-or-property element of mail, wire, and securities fraud because to do so would criminalize any employee's breach of fiduciary duty and authorize an easy end-run around *Skilling*.[27]

The gist of the government's conspiracy charge against Skilling was that he participated in a scheme "to defraud Enron's shareholders by misrepresenting the company's fiscal health, thereby artificially inflating its stock price," in order to obtain his own executive "*salary, bonuses,* grants of *stock and stock options,* other profits, and prestige." 130 S. Ct. at 2908, 2934 (emphasis added). None was enough to secure a conviction. Just as in *Skilling*, the government accused Stinn of participating in a scheme to defraud Friedman's or its shareholders by holding "his own financial interests above those of Friedman's investors," 4697:11-12. In other words, he allegedly ran Friedman's in a way that would increase earnings, thereby artificially inflating its stock price, in order to aggrandize Stinn's "handsome *salary,* huge bonuses, tax free *stock* grants, *options* to buy more *stock,*"

---

[27] The limitations of *McNally* were intended to prevent such convictions. Justice Stevens' dissent in *McNally* suggested that self-dealing while receiving compensation satisfied the mail and wire fraud statutes because "when a person is being paid a salary for his loyal services, any breach of that loyalty would appear to carry with it some loss of money to the employer-who is not getting what he paid for." *McNally*, 483 U.S. at 377 (Stevens, J., dissenting). That this theory was not adopted by the majority demonstrates that it is not the law.

and other employee benefits. 408:8-11 (emphasis added); Superseding Indictment, ¶ 39-40. The references to "salary" thus do not differentiate Stinn from the identical honest services theory argued in *Skilling*, and the government may not now abandon that theory, having relied upon it to obtain Stinn's conviction.

Other courts have held that the receipt of a salary is not evidence of the kind of private benefit that justifies an honest services conviction and that allegations such as those against Stinn are properly analyzed as honest services prosecutions. *United States v. Thompson*, 484 F.3d 877, 994 (7th Cir. 2007) ("We now hold that neither an increase in salary for doing what one's superiors deem a good job, nor an addition to one's peace of mind, is a 'private benefit' for the purpose of § 1346."); *United States v. Ratcliff*, 488 F.3d 639, 643-44 (5th Cir. 2007); *see generally*, *Sorich v. United States*, 129 S. Ct. 1308 (2009) (dissent from denial of certiorari in case that previewed the decision in *Skilling*, and noting that honest services would cover "any self-dealing by a corporate officer," including "a salaried employee's phoning in sick to go to a ball game").

It is no answer to say that the salary theory will fulfill the traditional money/property fraud element even if it does not establish honest services fraud. The salary theory proves neither theory. *See United States v. Collier*, Criminal Action No. 5:08-cr-40(HL), 2009 WL 88383, at *3 (M.D. Ga. 2009) ("Despite the use of the word 'money' in reference to Blitch maintaining his salary [while engaging in dishonest conduct], the allegations are nothing more than allegations of intangible acts of defrauding the public of honest services."); *United States v. Ratcliff*, 488 F.3d 639, 643-44 (5th Cir. 2007) (concealing campaign finance violations in order to win election as parish president and earn the president's salary did not allege a scheme to defraud the parish of money); *United States v. Billmyer*, 94-29-01-JD, -03-JD, 04-JD, 1995 WL 54471, at *9 (D. N.H. Feb. 3, 1995) (rejecting argument that defendants defrauded their employer of salary because they violated their employer's conflict-of-interest policy while continuing

33

to earn salaries); *Claire's Stores, Inc. v. Abrams*, No. 86 C 9851, 1989 WL 134959, at *4 (N.D. Ill. Oct. 16, 1989) (post-*McNally* decision rejecting salary and bonus as constituting property within meaning of fraud statutes where defendant executives were accused of breaches of fiduciary duty by "failing to take necessary markdowns" on inventory, thus defrauding employer of "tangible property rights in the form of salary and bonuses", because "allowing such a creative argument to succeed would have the effect of deeming *McNally* and its progeny a nullity").

In short, the government may not now undermine *Skilling* by omitting a reference to section 1346 in its indictment and arguing that an employee's salary satisfies the money/property element.  Civil securities law further supports this point.[28]  The Second Circuit recently explained that "in attempting to show that a defendant had fraudulent intent, it is not sufficient to allege goals that are possessed by virtually all corporate insiders, such as the desire to maintain a high credit rating for the corporation or otherwise sustain the appearance of corporate profitability or the success of an investment, or the desire to maintain a high stock price in order to increase executive compensation."  *South Cherry Street, LLC v. Hennessee Group LLC*, 573 F.3d 98, 108-09 (2d Cir. 2009).  Instead, civil plaintiffs can demonstrate fraudulent intent only "when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit." *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (rejecting allegation that defendants "had the requisite motive because they received bonuses based on corporate earnings and higher stock prices").

---

[28]  "[S]ecurities law precedent in civil litigation has been freely applied in the criminal context," *United States v. Stewart*, 305 F. Supp. 2d 368, 371 (S.D.N.Y. 2004), because "[t]he majority of Securities Acts cases are civil rather than criminal in nature," *United States v. Johnson*, 718 F.2d 1317, 1332 (2d Cir. 1983).

Here, the government argued that Stinn should be convicted because he had "goals that are possessed by virtually all corporate insiders," such as "executive compensation." *South Cherry Street*, 573 F.3d at 109. No reasonable person in Stinn's shoes could fairly predict how twelve jurors would interpret such terms as "strict credit application guidelines" and "generally to write-off" when asked, years later, to render a criminal verdict pursuant to the charges alleged, proof adduced, and arguments made. A reasonable person would not expect to spend twelve years in prison because he set a fully disclosed fourth-quarter bad debt reserve "too low."[29] No reasonable person could expect a prison sentence for allowing employees to exercise discretion when granting credit to customers in light of the company's consistent disclosure that employees did exercise discretion, 1659:2-1660:5; 2288:8-2290:6; 3407:1-3408:20, and a single sentence in the Risk Factors section of the Form 10K that said there were strict *credit application* guidelines. Seki Decl. Ex. 4 at 24; *see In re Federated Department Stores, Inc., Sec. Litig.*, No. 00 CV 6362 (RCC), 2004 WL 444559 (S.D.N.Y. Mar. 11, 2004) (plaintiff failed to state a cause of action where defendant company loosened fraud guidelines and reduced bad debt reserves, without disclosing the reductions to investors).[30] The Supreme Court has long recognized the "basic

---

[29] In the civil context, allegations that a reserve was set "too low" are typically dismissed as insufficient. *Alaska Electrical Pension Fund v. Adecco S.A.*, 371 F. Supp. 2d 1203 (S.D. Cal. 2005) ("plaintiffs must allege with particularity facts that show the initial prediction was 'a falsehood'" (quoting *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1549 (9th Cir. 1994) (en banc)); *In re MCI Worldcom, Inc. Sec. Litig.*, 191 F. Supp. 2d 778, 790 (S.D. Miss. 2002) (no civil liability for a "too low" reserve unless the plaintiff alleges that "no reasonable accountant would have made the same decision if confronted with the same facts.'") (quoting *In re Miller Indus., Inc.*, 120 F. Supp. 2d 1371, 1382 (N.D. Ga. 2000)). In this case, Friedman's disclosed its 10% fourth quarter reserve. Seki Decl Ex. 4 (2002 Form 10K) at 6. Further, the board "always" vetted the reserve with an outside auditor. 2050:9-15.

[30] If Stinn's conviction were to be based on falsehoods to obtain a salary (because money or property are required to convict Stinn in the wake of Skilling), the lack of a nexus between the purported lies about Friedman's credit-granting practices and any decision to award Stinn a certain salary or retain his employment are fatal to the government's theory.

principle that a criminal statute must give fair warning of the conduct that it makes a crime," *Bouie v. City of Columbia,* 378 U.S. 347, 350 (1964), and this is what motivated the opinion in *Skilling*.

B. <u>The Government's Failure to Cite Section 1346 in the Indictment or Request a Jury Instruction on "Honest Services" Does Not Change the Result</u>

The government may argue that the Stinn prosecution was different from the *Skilling* prosecution because the indictment did not specifically mention section 1346 and the government did not request an "honest services" jury instruction. That argument fails for several reasons.

First, the significant factor is whether the government *argued* dishonest services, not whether it cited section 1346 in the indictment or asked for a jury instruction. After all, the dishonest services/breach of fiduciary duty theory was used under the general rubric of "scheme to defraud" long before Congress passed a law giving it an official name through section 1346. Prosecutors argued the theory to juries repeatedly over many years, and courts upheld the resulting convictions, until the Supreme Court called a halt to the practice in *McNally*. The Fifth Circuit in *Skilling* defined the honest services concept as follows: "(1) a material breach of a fiduciary duty imposed under state law, including duties defined by the employer-employee relationship, (2) that results in a detriment to the employer." 554 F.3d at 547 (footnotes deleted). That language is not found in section 1346; it is one of the judicial definitions of honest services fraud theory developed before *McNally* and resurrected after section 1346 was enacted. Section 1346 was merely a shorthand attempt to reinstate **all** of the caselaw rejected by *McNally*. The Supreme Court in *Skilling* relied on the Due Process Clause to limit the body of caselaw that underlies the prosecution theory referred to by section 1346, *see Skilling* at 2927 (section 1346 was adopted "specifically to cover one of the 'intangible rights' that lower courts had protected ... prior to

*McNally*: 'the intangible right of honest services'") (quoting *Cleveland v. United States*, 531 U.S. 12, 19-20 (2000)).

The government's reliance on a dishonest services theory was not lost on Stinn. He argued throughout his motion to dismiss that the indictment was based on alleged breaches of fiduciary duty and mismanagement, and that it expressed a theory of dishonest services, *see* Dkt #134 at 53.  Indeed, Stinn requested an appropriate "honest services" jury instruction to guide the jury on that theory's limits, but the trial judge failed to give one.  *See* Dkt. #196 (December 17, 2007 Defendant's Proposed Jury Instruction No. 22).  The government nevertheless argued repeatedly that Stinn "lied," breached his fiduciary duties, and mismanaged the company in order to increase reported earnings and distort the currency and delinquency figures while receiving "handsome" compensation. *See, e.g.,* 408:8-11 (opening statement); 532:1-10 (Professor Pan); 685:89-11 (Stinn projected a false image to the public); 854:8-13 (jury charge conference); 4123:9-12; 4152:12-25 (closing argument).

Second, the government itself has taken the position that it may obtain a conviction based on a dishonest services theory without a reference to honest services or section 1346 in the indictment, and without a jury instruction on honest services or the language of section 1346. *See United States v. Redzic*, 569 F.3d 841, *vacated*, --- U.S. ----, 130 S.Ct. 3543, *affirmed on remand*, 627 F.3d 683 (8th Cir. 2010).  It cannot take a contrary position here.

Third, the jury instructions authorized the jury to convict if it found that Stinn deprived Friedman's or investors of any "property rights."  That undoubtedly included the salary Stinn received at the time he allegedly breached his fiduciary duty of honesty and loyalty.  In fact, the government was allowed to make that argument and made it over and over again.  The jury instructions merely said that the jury had to find that someone suffered "some harm" to "property rights."  *See* 4403:1-4 (scheme means a "course of action that intends some harm to the property rights of another" that need not be shown by "direct evidence");

4405:15-18 ("government must prove … that the scheme to defraud contemplated or intended some harm to property rights of another"). The government argued that property rights meant the board's and shareholders' rights to honest and loyal services. *See, e.g.*, 4200:24-4201:5 ("Along the way he lost all regard for his fiduciary duties and his legal responsibilities to the shareholders and to the investing public. When it suited his purposes he omitted to tell them important information, misled them and told them outright lies and for that he is guilty, guilty of securities fraud, mail fraud and conspiracy.")

Nothing in the jury instructions foreclosed the jury from convicting if it concluded that Stinn violated his duties while being paid a salary and that such payment was contingent on performing honest services (as defined by the prosecutor). And nothing in the jury instructions cautioned the jury against finding a scheme based on Stinn's dishonest services. Indeed, that is exactly what the government argued the jury should do: "you know all about the defendant's lies and about the money he received as a result of those lies. And you know that the defendant is guilty of the charges in this case." 4351:3-7.

In fact, the jury charge in *Redzic* referred to a far more tangible version of "property" than the broad and amorphous "property right" language included in the Stinn jury instructions. The *Redzic* instruction said the jury could convict if it found that the defendant intended to "deceive or cheat another out of *property* by employing material falsehoods. It also means the obtaining of *property* from another by means of material false representations or promises." Seki Decl. Ex. 7 (Redzic Inst. 11 and 12) (emphasis added). In addition, the *Redzic* trial court defined "intent to defraud" as an intent to "deceive someone for the purpose of causing some loss of *property* to another or bringing about some financial gain to oneself or another to the detriment of a third party." *Id.* (emphasis added).

The government argued successfully in *Redzic* that its instruction authorized the jury to convict the defendant for honest services fraud. Certainly then, the broader Stinn jury instruction authorized that same result.

38

## C. The Salary Theory Tainted the Entire Trial

The salary theory permeated the case. The indictment did not separate out the different allegations by count. For example, there was no separate count that alleged Stinn manipulated the earnings per share number by failing to write off the X files immediately; there was no separate count alleging Stinn increased earnings per share by using a 10% bad debt reserve for the fourth quarter in several years; and there was no separate count alleging that Stinn breached his duty of honesty when he failed to tell the Board about the X files. Instead, the government made the strategic choice to allege that Stinn took part in "one big conspiracy" and expressly refused to allege its claims "transaction after transaction." 842:6-12; 19-20.[31] The government raised the theory in its opening statement, called witnesses to prove it, and relied on it in closing.

That government strategy made it easier for the government to win: It could argue that "everything" was a reason to convict Stinn. Having chosen to argue Stinn's salary constituted the proceeds of his breaches of fiduciary duty, and having failed to adduce any proof that Stinn received illicit remuneration in the form of any bribe or kickback, the government is now bound by the Supreme Court's decision in *Skilling*. Even if there were some creditable theory among the government's smorgasbord of choices of the jury, it is impossible to tell which theory formed the basis for the jury's verdict. *See Yates v. United States*, 354 U.S. 298 (1957). This is especially true given the evidentiary deficiencies impacting each claim, as explained above – such as the failure to show that any of Stinn's actions had any material impact on Friedman's earnings.

In sum, there is no way to know whether the jury decided to convict Stinn because he breached his fiduciary duty by setting too low a reserve or by failing to change the phrase "strict credit application guidelines" in Friedman's 10-K while

---

[31] Stinn pointed out this defect in its pretrial motion to dismiss, Dkt. #134 at 8, and reasserted the argument in his motion for a judgment of acquittal, 3575:4-5.

receiving a salary, or by deciding to try to collect the X files in 2002, thus delaying their write-off and possibly increasing his chance for a bonus, or by failing to provide proper "guidance."

### D. The Government's Successful Objection to a Special Verdict Forecloses Any Harmless Error Analysis

The government may request harmless error analysis under *Yates*, 354 U.S. 298, and *Hedgpeth v. Pulido*, 555 U.S. 57 (2008). But Stinn asked for a special verdict, requesting that the jury identify the money or property that was stolen or the transactions it found to be fraudulent. 842:6-18; 4083:4-22; Dkt. #271 (letter dated March 8, 2008). The government objected, and the court denied Stinn's request. 4091:18-4092:16. By objecting, the government waived any right to harmless error analysis.

Special verdicts are "generally disfavored," *United States v. Pforzheimer*, 826 F.2d 200, 205 (2d Cir. 1987), ***unless*** the defendant requests one. *United States v. Margiotta*, 646 F.2d 729, 733 (2d Cir. 1981) (the "prohibition is for the benefit of the defendant"); *United States v. Dennis*, 786 F.2d 1029, 1041 (11th Cir. 1986), *cert. denied*, 481 U.S. 1037 (1987); *see also United States v. Ogull*, 149 F. Supp. 272, 275-78 (S.D.N.Y. 1957). The Second Circuit has a "preference for special interrogatories in particularly complex criminal cases," *United States v. Ogando*, 968 F.2d 146, 149 (2d Cir. 1992), and especially in cases, as here, where "the indictment may be ambiguous" about an element (such as what money or property Stinn allegedly took), *see United States v. McCourty*, 562 F.3d 458, 470 (2d Cir. 2009).

When the defendant expressly requests a special verdict (as here), and the government successfully defeats the defendant's request, the government is judicially estopped from asking the court to speculate whether the jury may have decided the case on a legal theory: that would be "clearly inconsistent with its earlier position." *Zedner v. United States*, 547 U.S. 489, 504 (2006) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001)). If the government can waive

arguments by failing to raise them, *see, e.g., United States v. Quiroz*, 22 F.3d 489 (2d Cir. 1994), it certainly can waive harmless error review when it makes a tactical decision to oppose a special verdict that would have revealed the jury's reasoning. *See United States v. Quinones*, 511 F.3d 289, 321 (2d Cir. 2007) (tactical decision waives argument on appeal).[32]

## IV. THE GOVERNMENT'S "BONUS" AND "LOSS OF CONTROL" THEORIES ARE CONSTITUTIONALLY DEFECTIVE

The government's two possible alternate theories – the "bonus theory" and the "loss of control theory" – are both unconstitutional after *Skilling* and, in any event, they cannot support Stinn's conviction.

### A. The Bonus Theory Is Defective

The government's bonus theory was that Stinn received a bonus for 2002 because the X files were not completely written-off in 2002, which increased 2002 earnings to the point that justified a bonus.[33] That theory is invalid.

---

[32]  The Fifth Circuit recently ruled that Skilling's conviction should be affirmed because the government's honest services arguments were harmless error. *United States v. Skilling*, No. 06–20885, --- F.3d ----, 2011 WL 1290805 (5th Cir. Apr. 6, 2011). Notably, the government made no attempt to convince the Fifth Circuit that salary and bonus were tangible money and property, and instead contended that the jury would have voted to convict for conspiracy based on 10b-5 securities fraud alone. There is no "money/property" element in a 10b-5 allegation, and thus the government in *Skilling* was only required to prove the traditional 10b-5 elements. *See United States v. Finnerty*, 533 F.3d 143, 146 (2d Cir. 2008) (stating elements). The court abandoned the test announced in *Yates* that an error is not harmless if it is "impossible to tell" beyond a reasonable doubt that a rational jury would have convicted the defendant solely on a valid theory, and instead adopted an incorrect test that there was "overwhelming evidence" of a violation of the 10b-5 claim.

The government did not charge Stinn with a 10b-5 violation (17 C.F.R. § 240.10b-5); the section 1348 securities fraud claim carries with it the same money/property element (or dishonest services with a bribe or kickback) as mail fraud. *See McNally v. United States*, 483 U.S. 350, 358-359, 365 (1987). Thus, the Fifth Circuit's April 2011 decision applied the wrong standard of harmless error, and its analysis of the evidence has no application here in any event.

[33]  The government also asserted that earnings in 2002 were increased because earnings in 2001 were decreased when Stinn and Brinkley decided to close a number of stores in

First, components of an executive's (or other employee's) compensation are often connected to the company's performance or earnings. A rule that allows the government to secure a conviction based on any employee action or inaction that inflates earnings because the employee may also benefit financially is impermissible after *Skilling*. A bonus based on earnings achieved through business decisions (aggressive or conservative) is simply additional compensation. Compensation alone may not serve as a basis for a fraud conviction. *See, e.g.*, *Claire's Stores, Inc.*, 1989 WL 134959, at *4; *United States v. Goyal*, 629 F.3d at 919.

Put another way, the government claimed that Stinn was required to direct that all of the X files be written off in fiscal 2002 because they were over 120 days old and the company policy stated that Friedman's "generally" writes off 120-day-old accounts, if deemed uncollectible. Stinn's decision to try to collect accounts that the head of Friedman's credit department *deemed collectible*, and write off the uncollected portion of those accounts at the end of 2002 and the start of 2003 was fraud, according to the government, because Stinn allegedly wanted to lessen the impact of the write-off on earnings and increase his chance for a bonus. The defect in such a prosecution (even if one assumes that there was a meaningful discrepancy between the practice and the public disclosure) is that it criminalizes the kind of conflict of interest that the Supreme Court rejected in *Skilling* as an "amorphous" category of cases, even with proof that the defendant had a "specific intent to deceive." 130 S.Ct. at 2932, 2933 n.44.

Second, the government did not prove that Stinn received his bonus for 2002 *because* a part of the X files was written-off in 2003 rather than in 2002. It never offered evidence of the "true" 2002 earnings for Friedman's with and

_____

2001 and created proper and improper reserves as "rainy day funds." 2346:6-2349:23. That assertion is just more of the same invalid argument that business decisions made with the intent to increase earnings (which would also increase an employee's chance of a bonus) constitutes fraud. The fact that Stinn cancelled bonuses in 2002 belies the idea that he closed stores in 2001 in order to earn a bonus in 2002.

without the portion written-off in fiscal 2003. It similarly never tried to prove the earnings numbers with and without the rebate that was recorded in revenue for 2002. Stinn made this point in moving to dismiss the indictment, Dkt. #134 at 57-59, and he renewed it in his Rule 29 motion.

Moreover, the government's proof showed that Stinn's bonus for 2002 was not based on the treatment of the X files at all. The government's witnesses testified that Stinn cancelled bonuses in light of the X files and then only authorized them to be paid when Friedman's received the unexpected tariff rebate. Thus, even if the Supreme Court were to uphold a "bonus theory" as a proper object of a money or property scheme (and it would not in light of *Skilling*), it would require proof of causation that, according to the government's own evidence, was completely absent here.

B. The "Right to Control" Theory is Defective

The trial court theorized that Stinn could be guilty because he deprived investors (or potential investors) of their "right to control" their own money. 4042:11-18. This theory was proposed by the government, citing *United States v. Wallach*, 935 F.2d 445, 462-63 (2d Cir. 1991), Dkt #222 at 12, which adopted a "right to control" theory for Title 18 fraud prosecutions.

In *Wallach*, the court affirmed fraud convictions for a company consultant who was paid $1 million for services and for a company director and officer who received part of that payment because "the corporation and its shareholders did not receive the services that they believed were being provided." *Id.* at 461. It held that shareholders had a "right to control" how the company's money was spent, *id.* at 462, and a shareholder's "right to monitor and to police the behavior of the corporation and its officers is a property interest" that may form the basis for a fraud conviction. *Id.* at 463. Specifically, the consultant and director "set up a

scheme to conceal the true nature of their dealings and the ultimate recipients of the payments." *Id.*[34]

The trial court in this case repeated the *Wallach* right to control theory during a discussion with counsel, and then characterized and broadened *Wallach* in its jury instruction as authorizing conviction where the government proved that "the defendant intended that other individuals would make investment decisions as to Friedman's shares based on materially fraudulent representations." 4405:22-24.

The "right to control" theory is defective and, in any event, cannot save Stinn's conviction for the government.

First, it did not survive *Skilling*. *Wallach* cited to *United States v. Little*, 889 F.2d 1367 (5th Cir. 1990), for the theory. In *Little*, the Fifth Circuit theorized that concealing economic information can constitute "property" within the meaning of the fraud statutes. The Fifth Circuit recognized that *McNally* undermined its "concealing information" theory, but reasoned that Congress reinstated the theory with the passage of section 1346. *Id.* at 1368-69. *Skilling* reinstated the *McNally* holding except as to bribe or kickback cases and thus eliminated the viability of fraud theories espoused by *Little* and *Wallach*.

The Second Circuit developed the right to control theory by relying on *United States v. Mandel*, 591 F.2d 1347, 1361 (4th Cir. 1979) ("some schemes of non-disclosure and concealment of material information come within the purview of the mail fraud statute"), in cases such as *United States v. Bronston*, 658 F.2d 920, 926 (2d Cir. 1981) ("the concealment by a fiduciary of material information which he is under a duty to disclose to another under circumstances where the non-disclosure could or does result in harm to the other is a violation of the

---

[34] The court also held: "These misrepresentations permitted the officers to pay out large sums from the corporation to undisclosed individuals for what were purportedly improper purposes, while maintaining the facade that these payments were in furtherance of legitimate corporate goals. By concealing this information, the value of Wedtech stock was obscured and the shareholders and the corporation were deprived of the opportunity to make informed decisions." *Id.* at 463-64.

44

statute"), and *United States v. Von Barta*, 635 F.2d 999, 1006 (2d Cir. 1980) ("The additional element which frequently transforms a mere fiduciary breach into a criminal offense is a violation of the employee's duty to disclose material information to his employer."). In *Skilling*, the Supreme Court found that *Mandel*'s "some schemes of non-disclosure" fell squarely into the broadly defined honest services category and expressly rejected the theory as too "amorphous." 130 S.Ct. at 2932.

Second, the theory that shareholders are defrauded when company officers do not give them all the information they may want is just the converse of the theory that corporate executives have fiduciary duties of honesty and, upon breach, have committed criminal fraud. The government failed to persuade the Court that Skilling committed fraud by concealing from investors "information which was critical for them to make good decisions about what to do with their own stock." 2010 WL 302206, at *33 (Gov't Brief in *Skilling*).

Third, *Wallach*, which involved improper side payments, was limited significantly by subsequent Second Circuit opinions to a shareholder's right to control discretionary corporate spending or the rights of banks or insurers to decide whether to extend loans or insurance based on full information – not the decision of whether to invest (or maintain one's investment) in a public company. *See United States v. Rossomando*, 144 F.3d 197 (2d Cir. 1998) (right to control information must be of some independent value or bear on the ultimate value of the transaction) (citing *United States v. Dinome*, 86 F.3d 277, 284 (2d Cir. 1996)). Those opinions concern misrepresentations that directly and materially impaired the exercise of control, such as the fraudulent insurance claims that prevented an insurer from determining the correct amount of recovery in *United States v. Rodolitz*, 786 F.2d 77, 80-81 (2d Cir. 1986). Other courts reject the theory completely. *United States v. Zauber*, 857 F.2d 137, 146-47 (3d Cir. 1988) (rejecting the right to control expenditures as a property right under the mail fraud statute).

45

Finally, the "right to control" theory in this case was really two different under-developed theories (existing shareholders' right to control Friedman's current assets and potential investors' decision to invest based on the 2003 Prospectus) mixed into the government's grab bag of theories. The first sub-theory was expressly rejected by *Skilling* – the rationale described in *Wallach* that executives commit fraud when they spend corporate money in a way contrary to shareholders' interests was based on cases the Court overturned. The second sub-theory – that a false offering circular could form the basis for a criminal prosecution based on allegedly false statements without proof of a money or property loss – may be a Rule 10b-5 claim, but Stinn was not charged with that offense.

In any event, the government's strategic decision to mix all the facts and all the theories requires that all the convictions fail – especially because Stinn asked the court to separate out the transactions and property theories for the jury. *See Siddiqi v. United States*, 98 F.3d 1427, 1438 (2d Cir. 1996) ("We find the ointment's fly in the failure of the government to settle upon a single theory of guilt and, then, at this final stage, in seizing upon a theory that is inadequate as a matter of law.").[35]

---

[35] While the evidence supports no viable theory that would sustain Stinn's conviction, it is not Stinn's burden to show that this is the case. The government must establish that the legally invalid honest services theory could not have served as the basis for the jury's guilty verdict, not simply that some legally valid theory exists and has evidentiary support. "[A] court may not affirm a conviction based solely on overwhelming evidence of the properly instructed ground." *United States v. Holly*, 488 F.3d 1298, 1307 n.6 (10th Cir. 2007) (citing *Stromberg*, 283 U.S. 359, 368 (1931)). Although the Second Circuit followed a different approach in *United States v. Jackson*, 196 F.3d 383 (2d Cir. 1999), it questioned its decision in *Monsanto v. United States*, 348 F.3d 345, 350-51 (2d Cir. 2003). This issue – whether a court may deem an error "harmless" solely because the government's remaining evidence supports guilt, without assessing the impact of the error on the jury – is the subject of a currently pending petition for writ of certiorari filed in *Black v. United States*, 79 USLW 3494 (Feb. 17, 2011) (No. 10-1038).

## CONCLUSION

For the foregoing reasons, Stinn respectfully requests that the judgment against him be vacated.

Dated: April 27, 2011

Respectfully submitted,

BOIES, SCHILLER & FLEXNER LLP

David W. Shapiro DS-8121
1999 Harrison Street, Suite 900
Oakland, CA 94612
Telephone: (510) 874-1000
Facsimile: (510) 874-1460
dshapiro@bsfllp.com

Attorneys for Defendant Bradley Stinn

47