UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
**BRADLEY J. STINN,**

                      Petitioner,

  - against -

**UNITED STATES OF AMERICA,**

                      Respondent.

------------------------------------------------------x

**OPINION & ORDER**

**11-cv-2071 (NG)**

**GERSHON, United States District Judge:**

On October 24, 2009, after a seven week jury trial, petitioner, former CEO of Friedman's Inc. ("Friedman's), was found guilty by the jury of one count of securities fraud under 18 U.S.C. § 1348, one count of mail fraud under 18 U.S.C. § 1341, and one count of conspiracy to commit securities fraud, mail fraud, and wire fraud under 18 U.S.C. § 1349. The jury also returned a verdict against defendant on the issue of forfeiture, in the amount of $1,019,000, which represented the proceeds of the offenses for which petitioner was convicted.

Stinn now petitions, pursuant to 28 U.S.C. § 2255, for a writ of habeas corpus. In his petition, Stinn raises one claim—dealing with the scope of honest services fraud under § 1346—that he could have, but did not, raise on direct appeal, and another claim—dealing with the dismissal of a juror during deliberations—that he raised on direct appeal, but which was rejected by the Second Circuit. *United States v. Stinn*, 379 Fed. Appx. 19 (2d Cir. 2010). In denying petitioner's motion for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure, I noted that, in the face of voluminous evidence supporting the convictions, "defendant's motion papers distort and mischaracterize the evidence produced at trial and, most importantly, ignore the mass of evidence which supports the government's position." Petitioner,

1

who is represented by the same attorney who represented him at trial and on the Rule 29 motion, again massively distorts the trial record and case law, and, in response to the government's opposition to the § 2255 motion, seriously mischaracterizes the government's positions. Understanding these tactics is essential to understanding the petition's lack of merit.

I. BACKGROUND

On December 3, 2007, the government filed a superseding indictment against petitioner, alleging mail fraud, securities fraud, and conspiracy to commit mail, wire, and securities fraud. The government alleged that petitioner "engaged in a scheme to defraud investors by, among other things, falsifying Friedman's accounting data and misrepresenting Friedman's financial condition in public statements and reports." The government alleged that petitioner's scheme was designed to "obtain money and property from shareholders and the investing public." The indictment did not charge petitioner with depriving Friedman's of petitioner's honest services.

As I stated when I denied petitioner's motion for a judgment of acquittal under Rule 29, the government, at trial, "introduced voluminous evidence establishing that Stinn knowingly and willfully, with the specific intent to defraud, engaged in a scheme to materially misrepresent Friedman's true financial condition . . . ." The government presented evidence that petitioner made a variety of material misrepresentations to Friedman's shareholders, auditors, and analysts about Friedman's credit-granting policies and delinquent accounts, and that he manipulated Friedman's allowance for doubtful accounts (and other reserves) in order to meet or exceed market expectations for earnings per share ("EPS"). Petitioner's misstatements were also included in public filings made with the Securities and Exchange Commission ("SEC"). Among the evidence presented was first-hand testimony from Friedman's former Chief Financial Officer, Victor Suglia, and its former Controller, John Mauro (as well as other Friedman's

2

employees), who both testified that they regularly worked on and discussed with Stinn the accounting manipulations that were used to meet the desired EPS. For example, Suglia testified that he and Stinn would "basically arrive at a [EPS] number . . . and . . . manipulate the accounting records to arrive at that number." Tr. at 1006–1010.[1] Suglia testified that he maintained a list of reserves, including the reserve for doubtful accounts, that could be manipulated.

There was also testimony about how petitioner participated in a "scooping" scheme, in which the books would be left open for several days past quarter end in an effort to pull revenue from a future quarter into the current quarter. Mauro testified that fiscal periods would be "kept open for maybe another week or two, and payments made in that period subsequent to our period end date were then applied . . . as if they occurred" in the previous period. Tr. at 2330–31. Mauro testified that scooping was openly discussed at company meetings and that petitioner participated in these discussions and approved the decisions. *Id.* at 2331. Mauro testified that scooping occurred at every quarter end and at every year end. Mauro's testimony outlined in detail this and other accounting manipulations and misstatements used to ensure that Friedman's reported EPS figures were on par with forecasts. Also in evidence were voluminous documents that supported the testimony of Suglia and Mauro.

And finally, the government presented testimony and documentary evidence regarding the proceeds of petitioner's fraud. The government showed that petitioner received raises, bonuses, and stock incentives tied directly to Friedman's fraudulently inflated EPS figures. Bob Cruickshank, the Chairman of Friedman's Compensation Committee, testified that Stinn's bonus, as well as other performance incentives, were the "direct result of the reported earnings"

---

[1] "Tr." refers to the trial transcript.

for 2002. Tr. at 1959–63. Likewise, both Suglia and Mauro testified that bonuses were linked directly to the company's EPS. Tr. at 1399–1402; Tr. at 2340. Suglia testified specifically that "absent the manipulation[s]," he and Stinn would have received no bonus for 2002. Tr. at 1400. Suglia also testified that he and Stinn made material misstatements in a September 2003 prospectus, which Friedman's used to complete a $44 million stock offering. Tr. at 1480–84.

Between November 11 and December 3, Friedman's made a series of corrective disclosures, which revealed the extent of petitioner's fraud. During that period, Friedman's also announced Stinn's resignation. By December 3, when the effect of petitioner's fraud had been disseminated to the market and incorporated into the company's share price, Friedman's had lost nearly half the market capitalization it had immediately prior to the company's first corrective disclosure on November 11. Tr. at 3219.[2]

At the close of evidence, the court instructed the jury on the elements of conspiracy, mail fraud, and securities fraud. Pertinently, the court instructed the jury that

> A 'scheme or artifice [to defraud]' in [the context of securities fraud] means a plan or course of action that intends some harm to the property rights of another. . . . . Thus a scheme to defraud is any plan, device or course of action to obtain money or property by false or fraudulent representations . . . . The government must prove beyond a reasonable doubt that the scheme contemplated or intended some harm to property rights of another. This requirement is satisfied if you find either that the government proved beyond a reasonable doubt that the defendant planned to obtain or actually obtained money from Friedman's by materially fraudulent representations or that the defendant intended that other individuals would make investment decisions as to Friedman's shares based on materially

---

[2] Throughout his petition, petitioner attempts to relitigate factual issues that were presented to the jury. A habeas petition, however, is not an avenue for relitigating issues of fact. *See Reiter v. United States*, 371 F. Supp. 2d 417, 429 (S.D.N.Y. 2005) ("[A] collateral attack on a final judgment in a federal criminal case is generally available under § 2255 only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice. A challenge to the sufficiency of the evidence falls well beyond these narrow limits.")

4

> fraudulent representations. However, you must be unanimous as to at least one of these alternatives.

Tr. at 4402–06. The court reiterated this instruction with regard to the "scheme or artifice to defraud" element of mail fraud and wire fraud. Tr. at 4421, 4429. Nowhere in the instructions did the court instruct the jury on honest services fraud or tell the jury they could find petitioner guilty if they found that petitioner's scheme intended to deprive Friedman's of his honest services.

During deliberations, a juror was dismissed for consulting with, and seeking advice from, an outside party regarding the difference between fraud and conspiracy.[3] After the dismissed juror was replaced with an alternate juror, and the jury deliberated anew, the jury found petitioner guilty on all counts. Stinn appealed his conviction, challenging only the court's giving of a conscious avoidance instruction and the handling of the juror's dismissal during deliberations. The Second Circuit affirmed, and the Supreme Court denied certiorari. *Stinn v. United States*, 131 S. Ct. 676 (2010). At no point in his direct appeal did petitioner assert that his conviction was based on an unconstitutional interpretation of § 1346, that his conduct fell outside the scope of § 1346, or that § 1346 should be struck down as unconstitutionally vague.

## II.  THE *SKILLING* CLAIM

Petitioner asserts that the Supreme Court's decision in *United States v. Skilling*, 130 S. Ct. 2896 (2010), applies to his case and requires reversal of his conviction. First, however, he argues that he can establish cause and prejudice for the procedural default that resulted from his

---

[3]   The dismissal of this juror forms the basis for petitioner's Sixth Amendment claim. As discussed below, however, petitioner's Sixth Amendment claim was raised and rejected on direct appeal and therefore may not be raised on collateral attack. Discussion of the facts surrounding the juror's dismissal is therefore unnecessary.

5

not having raised a *Skilling*-type argument on direct appeal.[4]

### A. The *Skilling* Decision

As an initial matter, it is important to determine the parameters of *Skilling*, because petitioner goes to great lengths to draw parallels between the evidence presented in *Skilling* and the evidence presented at his own trial. According to petitioner, *Skilling* now prevents all criminal prosecution for "an alleged scheme of non-disclosure and concealment of material information" in order to receive money and property such as "bonuses, grants of stock and stock options, [and] other profits . . . ." Def.'s Mem. of Law, at 19 (quoting *Skilling*, 130 S. Ct. at 2908). According to petitioner, the evidence the government used to convict in *Skilling* may now not form the basis of any mail or securities fraud conviction. Petitioner's argument greatly overstates the Court's holding in *Skilling*. *See Moore v. United States*, 2011 U.S. Dist. Lexis 115072, at *6 (S.D.N.Y. Oct. 5, 2011) ("[T]his Court joins a growing number of District Courts that have similarly recognized the limited implications of [*Skilling*]." (citations omitted)).

In *United States v. Skilling*, the Supreme Court was asked to determine the scope of honest services fraud, as defined in 18 U.S.C. § 1346, which states that "[f]or the purposes of this chapter [mail fraud, wire fraud, and other fraud offenses] . . . the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." In *Skilling*, the defendant, Jeffrey Skilling, former President of Enron Corporation, was convicted by a jury of 19 counts, including several counts of securities fraud, false statements to auditors, and one count of conspiracy to commit securities and wire fraud. The conspiracy count, and only the conspiracy count, alleged that Skilling, among other objects of

---

[4] Petitioner also argues that "petitioner need not show cause for his decision, on direct appeal, to await the *Skilling* decision before he pressed his preserved claim further." Petr.'s Mem. of Law, at 39. As discussed below, there is no basis for this argument.

the fraud, "depriv[ed] Enron and its shareholders of the intangible right of honest services . . . ." On appeal, Skilling argued that the honest services statute either did not cover his conduct or was unconstitutionally vague if it did. He also argued that other counts, despite not charging honest services fraud, "hinged on the conspiracy count" and therefore the convictions on those counts should also be reversed.

Agreeing, in part, with Skilling's arguments, the Court determined to construe, rather than invalidate, § 1346. In doing so, the court attempted to "pare [honest services precedent] down to its core . . . ." *Skilling*, 130 S. Ct. at 2928. After acknowledging that courts had not consistently applied § 1346, the Court nevertheless found that the "solid core" of honest services precedent involved "offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes." *Id.* at 2930. The Court then applied this construction to Skilling's convictions and determined that his conspiracy conviction should be vacated.[5]

Perhaps as important as what the *Skilling* Court held is what it did not. The *Skilling* Court said nothing about the sufficiency of the government's evidence to establish traditional money or property fraud. The Court merely held that, if the government charges, and the jury is instructed on, an honest services theory of fraud under § 1346, the government must prove that a defendant received bribes or kickbacks as a part of the deceptive scheme. Specifically, with regard to the profit Skilling reaped from his scheme, the Court held that "profit . . . through the receipt of salary and bonuses . . . and through the sale of approximately $200 million in Enron stock" was insufficient to constitute kickbacks or bribes *under an honest services theory*. The

---

[5] On remand, the Fifth Circuit found that because the "overwhelming evidence [also established] that Skilling committed securities fraud," the court could conclude beyond a reasonable doubt that the verdict would have been the same absent the alternative theory error. *United States v. Skilling*, 638 F.3d 480 (5th Cir. 2011), *cert. denied*, 2012 U.S. LEXIS 2781 (Apr. 16, 2012).

7

Court said nothing about whether salary increases, bonuses, or stock profits could constitute money or property for purposes of traditional 18 U.S.C. §§ 1341 or 1348 mail or securities fraud.[6] It is clear, therefore, that the statements made about the sufficiency of the evidence in *Skilling* apply only to prosecutions under 18 U.S.C. § 1346. *Moore*, 2011 U.S. Dist. Lexis 115072, at *6 ("*Skilling*'s clarification of the reach of section 1346 does not invalidate convictions not involving charges of a deprivation of the intangible right to honest services . . . .").

## B. Procedural Default

"Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either cause and actual prejudice or that he is actually innocent." *Bousley v. United States*, 523 U.S. 614, 622 (1998) (internal quotations and citations omitted). In other words, "[h]abeas review is an extraordinary remedy and will not be allowed to do service for an appeal." *Id.* at 621 (quotations omitted). Petitioner does not dispute that he raised no *Skilling*-type claims on direct review. Rather, petitioner claims that he can show cause for failing to raise the argument because "the law adverse to him was settled at the time of his appeal" and because "no courts had invalidated section 1346 because it was unconstitutionally vague."[7]

---

[6] It is important to note that Skilling was charged with securities fraud under 15 U.S.C. § 78(j)b and 78ff, which do not have a money or property element. Stinn was charged with securities fraud under 18 U.S.C. § 1348, which, as I charged the jury, does require a scheme to obtain money or property, as do mail fraud and wire fraud.

[7] In fact, petitioner's conviction was *not* final when *Skilling* was decided. A defendant's conviction does not become final until the Supreme Court denies certiorari or the time for moving for a writ of certiorari lapses. *See Guzman v. United States*, 404 F.3d 139, 140 (2d Cir. 2005). The Supreme Court decided *Skilling* on June 24, 2010, one month after the Second Circuit affirmed petitioner's conviction. But petitioner did not file his petition for a writ of certiorari until October 22, 2010. Despite the law of *Skilling* being available to petitioner, he

"Where a constitutional claim is so novel that its legal basis is not reasonably available to counsel, a defendant has cause for his failure to raise the claim in accordance with applicable . . . procedures." *Reed v. Ross*, 468 U.S. 1, 16 (1984). In this context, however, novelty means something greater than a likelihood that the claim would not succeed. "[F]utility cannot constitute cause if it means simply that a claim was 'unacceptable to that particular court at that particular time.'" *Bousley*, 523 U.S. at 623 (quoting *Engel v. Isaac*, 456 U.S. 107, 71 (1982)). Rather, for purposes of Stinn's challenge, novelty means the overturning of "a longstanding and widespread practice to which th[e Supreme] Court has not spoken, but which a near-unanimous body of lower court authority has expressly approved." *Reed*, 468 U.S. at 17.

Petitioner argues that he satisfies this standard, because courts in this country had universally upheld § 1346 against *facial* claims that it was unconstitutionally vague. But petitioner misapprehends the claim that was successful in *Skilling*. The Court in *Skilling* did not invalidate § 1346 as unconstitutionally vague. Instead, it construed the scope of § 1346 as excluding the conduct with which Skilling was charged. Viewed in this light, a claim that petitioner's conduct fell outside the scope of § 1346 was clearly available to petitioner at the time of his direct appeal. Indeed, "the Federal Reporters were replete with cases involving challenges" to the scope of § 1346. *Bousley*, 523 U.S. at 622; *see, e.g.*, *United States v. Inzunza*, 580 F.3d 894, 904 (9th Cir. 2009) ("While we have not squarely addressed whether § 1346 requires private gain, we have recently addressed "the need to find limiting principles to cabin the broad scope of § 1346."); *United States v. Sorich*, 523 F.3d 702, 708 (7th Cir. 2008) ("Our misuse-of-position-for-private-gain limitation has not been adopted by other circuits . . . . The

---

nevertheless chose to appeal to the Supreme Court only his arguments regarding his Fifth and Sixth Amendment rights to a unanimous jury. *See* Pet. for Writ of Cert., 2010 U.S. S. Ct. Briefs LEXIS 3320. This fact further supports the government's position as to procedural default.

9

Tenth Circuit . . . characterized it as an effort 'to judicially legislate by adding an element to honest services fraud which the text and structure of the fraud statutes do not justify.' And the Third Circuit stated that the requirement 'adds little clarity to the scope of § 1346 and is, among other things under-inclusive . . . .'" (citations omitted)); *United States v. Brown*, 459 F.3d 509, 520 (5th Cir. 2006) ("[T]he boundaries of 'intangible rights' may be difficult to discern, but that does not mean that it is difficult to determine whether a particular defendant violated them. If the court is not to lapse into defining a common law crime, the outer boundary of this facially vague criminal statute must be determined from the factual circumstances supporting affirmed convictions . . . .").[8] Moreover, the *Skilling* Court itself recognized that the "Courts of Appeals have divided on how best to interpret the statute" and have "disagreed about whether § 1346 prosecutions must be based on a violation of state law, whether a defendant must contemplate that the victim suffer economic harm, and whether the victim must act in pursuit of private gain." *Skilling*, 130 S. Ct. at 2928, 2928 n.36. Therefore, a claim regarding the limited scope of § 1346 was neither novel nor unavailable to petitioner at the time of his direct appeal.[9]

---

[8] In addition, the Second Circuit itself reversed a defendant's honest services conviction after finding that § 1346 was unconstitutionally vague as it applied to the defendant. *See United States v. Handakas*, 286 F.3d 92 (2d Cir. 2002). Although an en banc panel of the Second Circuit, in a subsequent case, overruled as unnecessary the constitutional ruling of *Handakas*, it found that Handakas's conduct fell outside the proper scope of § 1346. *See United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003) ("[Handakas's] actions therefore did not come within the reach of section 1346. There was thus no reason to reach the constitutional question . . . . In light of our duty to avoid passing on constitutional questions whenever possible, we overrule the unnecessary constitutional ruling in that case without reviewing it on its merits.")

[9] This finding is consistent with nearly all courts that have considered the issue thus far. *See, e.g.*, *Ryan v. United States*, 645 F.3d 913 (7th Cir. 2011); *United States v. Lynch*, 807 F. Supp. 2d 224 (E.D. Pa. 2011); *United States v. Jennings*, 2011 U.S. Dist. LEXIS 91081 (D. Minn. Aug. 15, 2011); *Forham v. United States*, 2012 U.S. Dist. LEXIS 19928 (S.D. Ga. Jan 24, 2012) (collecting additional cases). *But see Stayton v. United States*, 766 F. Supp. 2d 1260, 1266-67 (M.D. Ala. 2011); *United States v. McDonnell, 2011 U.S. Dist. LEXIS 66148 (C.D. Cal.

Finally, if petitioner in fact had been convicted under an honest services theory of fraud (which he was not), a claim that his conduct fell outside the proper scope of § 1346 would not have been futile, even prior to *Skilling*. *See United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003) (endorsing only two theories of honest services fraud: (1) bribery and kickback schemes; and (2) undisclosed self-dealing schemes, such as when an employee causes his employer to do business with a corporation in which the defendant has a secret, undisclosed interest). If petitioner, whose conduct fell outside these categories, indeed thought he was convicted of honest services fraud, it would have been appropriate to challenge the conviction pursuant to *Rybicki*'s parameters.

Petitioner's claim is therefore barred by procedural default.[10]

### C. The Lack of Merit of Petitioner's *Skilling* Claim

Even if petitioner had not defaulted a potential *Skilling* claim, the claim fails on the merits.

Petitioner argues that, despite no mention of honest services or § 1346 at his trial, the evidence introduced resulted in a conviction on a now-defunct honest services fraud theory. Petitioner argues that, because the government referred to Stinn violating his fiduciary duties to shareholders, the government was attempting to prove honest services fraud. In addition, petitioner argues that the alleged objects of his fraud (*i.e.*, salary increases, bonuses, and shareholders' right to control their assets) are invalid objects under a money or property theory of fraud, and therefore he was convicted under a veiled and unconstitutional honest services theory.

---

June 20, 2011).

[10] In addition to an inability to demonstrate cause, petitioner cannot, for the reasons stated below, demonstrate prejudice or actual innocence.

## 1. The government's indictment and the court's jury instructions

As an initial matter, it is critical to note that petitioner was not indicted under § 1346; the government, at trial, never referenced or argued § 1346 or honest services; and the jury was not instructed as to § 1346 or honest services fraud. For many courts, this has been the end of the inquiry. *See, e.g.*, *Moore v. United States*, 2011 U.S. Dist. LEXIS 115072, at *6 (S.D.N.Y. Oct. 5, 2011) ("[P]etitioner was not charged with depriving another of the intangible right to honest services [and] therefore, the Supreme Court's decision in *Skilling* does not affect . . . Petitioner's conviction . . . .") (collecting cases); *United States v. Washington*, 2011 U.S. Dist. LEXIS 113533, at *3 (N.D. Ill. Oct. 3, 2011) ("[Petitioner's] reliance on *Skilling* is misplaced as she was not charged with honest services fraud under § 1346.").

Petitioner argues that *United States v. Redzic*, 627 F.3d 683 (8th Cir. 2010), which upheld a conviction on a bribery or kickback theory of honest services fraud despite the lack of a specific reference in the indictment or jury charge to § 1346 or the phrase "honest services," supports his claim. Petitioner's reliance on *Redzic* is misplaced. First, in *Redzic*, the Eighth Circuit affirmed the defendant's conviction because the factual allegations in the indictment spelled out a "fraudulent scheme whereby the State of Missouri was deprived of its right to [the defendant's] honest services in a manner involving precisely the offense preserved in *Skilling*." *Id.* at 688. Second, in response to the defendant's arguments regarding the jury charge, the court found it significant that the charge defined "scheme or artifice to defraud" to "*include* any plan or course of action intended to deceive or cheat another out of property . . . ." *Id.* at 690 (emphasis added). As the Court stated, "According to this definition, the phrase scheme to defraud includes plans to deprive another of property but is *not necessarily limited to such plans*." *Id.* (emphasis added).

Here, petitioner's conduct was far from the "precise[ ] offense preserved in *Skilling*." More importantly, as discussed above, the jury instructions at petitioner's trial expressly stated that a scheme to defraud "*means* a plan . . . that intends some harm to the property rights of another" and that a scheme to defraud "*is* any plan . . . to obtain money or property by false or fraudulent representations." Moreover, in discussing the required state of mind, the jury was instructed that, in order to find petitioner guilty, it must find that "he willfully associated himself with the alleged fraudulent scheme with intent to deceive and to cause some harm to the *property rights* of another." Tr. at 4413 (emphasis added). The instructions leave no room for the jury to convict based on a deprivation of honest services. The instructions spell out that, in order to find petitioner guilty, the jury was required to find that petitioner intended to deprive his victims of money or property.[11]

On this basis alone, then, petitioner's conviction should be affirmed. However, looking past the indictment and jury instructions, and reviewing the evidence introduced at trial, petitioner's claim fails.

### 2. Petitioner's fiduciary duties

Petitioner argues that, because the government referred to the fact that he violated his fiduciary duties to Friedman's shareholders, it was necessarily attempting to prove an honest services theory of fraud. Petitioner scours a trial record of over four thousand pages to recite several isolated instances of the government referencing his violations of the fiduciary duty of loyalty. But petitioner significantly mischaracterizes the references that he finds. For instance, Stinn asserts that the government argued that he "'sits in this courtroom' for breaching his fiduciary duties . . . ." Petr.'s Mem. of Law, at 23 (citing Tr. at 408). A review of page 408 of

---

[11] In this respect, it is important to note that § 1346 does not modify the phrase "money or property;" rather, it modifies "scheme or artifice to defraud."

13

the transcript, however, shows that the government actually said the following:

> [petitioner] sits in this courtroom because he lied. He lied to his stockholders. He lied to the investing public. He lied and lied, and all of those lies were about the financial condition of Friedman's. He sits in this courtroom because when he was confronted with the reality that Friedman's was suffering from financial problems and teetering on the brink of financial ruin, he hid those facts from stockholders.

Tr. 407–09. As petitioner notes, the government went on to state that "[h]e hid those facts from his stockholders so he could continue to pad his pockets with a handsome salary, huge bonuses, tax free stock grants, options to buy more stock, car allowances, and housing allowances." Tr. at 408. What petitioner ignores, however, is the voluminous evidence and government arguments reflecting a direct causal link between petitioner's fraudulent misrepresentations and money or property he obtained, as well as money or property of which shareholders were deprived. *See supra* pp. 3–4; *infra* pp. 15–19. Nothing about the government's evidence or arguments suggested to the jury that petitioner was guilty of fraud merely for violating his fiduciary duties and accepting a salary while doing so.

Petitioner also argues that, "Consistent with its approach in *Skilling*, the government established through its first witness that petitioner's conduct was to be judged by fiduciary duty standards . . . ." Petr.'s Mem. of Law, at 23. Again, this mischaracterizes the record. The government's first witness was Eric Pan, a professor of law at Cardozo School of Law. The overwhelming majority of Professor Pan's testimony, which spanned two days, concerned basic corporate structure, the workings of the national stock exchanges, corporate reporting requirements, and various accounting principles. Although he did make references to, and explain, the fiduciary duties a corporate officer owes to his shareholders, no reasonable juror would understand Professor Pan's testimony to be primarily (or even substantially) about fiduciary duties or as supporting the notion that Stinn was guilty of fraud merely for violating his

14

fiduciary duties.

In short, nothing in the government's arguments, or in the testimony or evidence presented, suggested to the jury that Stinn's violation of his fiduciary duties satisfied the "scheme or artifice to defraud" element of the crimes with which he was charged. The government's statements to the jury, that Stinn violated his fiduciary duties by lying to Friedman's shareholders, are merely a truism. When a Chief Executive Officer executes a scheme to artificially inflate EPS and distort the health of his company, all while reaping benefits tied directly to that health, it is, without a doubt, a violation of his fiduciary duty of loyalty. Merely referencing this fact does not transform money or property fraud into an honest services prosecution.

### 3. Salary increase, bonus, and right to control

Finally, petitioner asserts that the government's arguments regarding his salary, bonuses, and shareholder money lost through declining stock price transformed the case into an honest services prosecution. He argues that these are categorically invalid as objects of money or property fraud.

In an honest services prosecution under § 1346, the object of the fraud is the deprivation to the employer of the defendant's honest services. *United States v. Riley*, 621 F.3d 312, 327 (3d Cir. 2010). Here, petitioner implicitly acknowledges that the government never argued to the jurors that they could convict based on a deprivation of honest services. Rather, he argues that salary increases, bonuses, and stock losses cannot be valid objects of the scheme, and therefore the government was attempting a veiled honest services prosecution. There is no merit to this position.

Both the increased salary as well as the bonus that petitioner was awarded in 2002 clearly

15

constitute money or property, as required by 18 U.S.C. §§ 1341, 1343, and 1348. As discussed above, the government presented evidence that petitioner received a $300,000 salary increase and a $352,000 bonus as the direct result of Friedman's fraudulently inflated EPS. *See, e.g.*, Tr. at 1959–63; Tr. at 1399–1402; Tr. at 2340. Petitioner's conduct, therefore, constitutes textbook fraud in which "the victim's loss of money or property supplied the defendant's gain, with one the mirror image of the other . . . ." *Skilling*, 130 S. Ct. 2926. Friedman's, which would not have paid the bonus or salary increase absent the inflated EPS, was deprived of its money as a direct result of petitioner's fraud.

The cases cited by petitioner in support of his arguments regarding salary and bonuses are unpersuasive. In each of the cases cited by petitioner, the court rejected a salary theory premised on one of three things: (1) salary increases and/or bonuses awarded that were unrelated to the alleged misstatement or omission; (2) a defendant who continued to receive the same salary while making misstatements or omissions; or (3) a defendant who made a misstatement or omission to obtain a job, in a situation in which the victim would have paid the salary to someone in any event.[12] *See United States v. Thompson*, 484 F.3d 877 (7th Cir. 2007) (raise approved through "normal personnel practices" and not related to fraud); *United States v. Ratliff*, 488 F.3d 639 (5th Cir. 2007) (rejecting salary theory in the context of a defendant who obtained public position through election fraud, *but* stating that, "We do not dispute the Government's contention that a salary and other financial employment benefits can constitute 'money or

---

[12] With regard to the latter two situations, it may well be that such instances of fraud *can* satisfy the money or property element of §§ 1341 and 1348. The Second Circuit has yet to decide this issue. *See United States v. Coppola*, 2012 U.S. App. LEXIS 2854, at *35 (2d Cir. Feb. 14, 2012) ("We have no occasion to determine whether, as the government urges, this court has implicitly accepted that variant of the salary theory."). As the government here did not purport to invoke either of these variants of the salary theory, this court has no occasion to address them.

16

property' under the statute"); *United States v. Collier*, 2009 U.S. Dist. LEXIS 1670 (M.D. Ga. Jan. 12, 2009) ("Despite the use of the word 'money' in reference to Blitch *maintaining* his salary, the allegations are nothing more than allegations of intangible acts of defrauding the public of honest services." (emphasis added)).

None of these three circumstances is present in petitioner's case. Although petitioner appears to argue that the government attempted to satisfy the money or property element by showing that petitioner *maintained* the salary he was already receiving, the record does not support this assertion. Although the government did make references to petitioner receiving a "handsome salary," the government never argued that continuing to receive his normal salary satisfied the money or property element. To the contrary, the record is replete with instances in which the government proffered that petitioner's fraud resulted directly in his receiving a substantial raise and bonus. *See, e.g.*, Tr. at 450–51 ("[A]s a result of hitting these earnings targets, this defendant received $352,000 bonus."); Tr. at 451 ("On top of his $550,000 salary, the defendant collected a $352,000 bonus for keeping [the delinquent accounts] a secret . . . . He was also awarded $525,000 of stock, and 300,000 valuable options to buy more stock. So he earned more than double his Friedman's salary just by hitting earnings for 2002. And because of his success in 2002, he got himself a $350,000 raise."); Tr. at 4199 ("It was the defendant . . . who gained the most from this fraud, who gained higher salaries, hundreds of thousands of bonuses, stock options, interest free loans . . . ."). The government, therefore, proved that petitioner's scheme resulted directly in his obtaining money or property that he would not have otherwise obtained, absent his fraud.

Lastly, petitioner asserts that the government argued an impermissible "right to control" theory of fraud. According to petitioner, the government improperly asserted that he defrauded

investors by withholding material information and by issuing a prospectus filled with material misstatements.

The jury was instructed that it could convict petitioner if it found, *inter alia*, that "the defendant intended that other individuals would make investment decisions as to Friedman's shares based on materially fraudulent representations." Tr. at 4406.

When an officer or director fraudulently deprives a shareholder (or future shareholder) of valuable economic information, which causes tangible, economic harm to a shareholder's property interests, the money or property element of § 1341 and 1348 is satisfied. *See United States v. Carlo*, 507 F.3d 799, 802 (2d Cir. 2007) ("Since a defining feature of most property is the right to control the asset in question, we have recognized that the property interests protected by the statutes include the interest of a victim in controlling his or her own assets."); *United States v. Rossomando*, 144 F.3d 197, 201 n.5 (2d Cir. 1998) ("[T]he concrete harm [to the victim's property interest] contemplated by the defendant is to deny the victim the right to control its assets by depriving it of information necessary to make discretionary economic decisions."); *United States v. Wallach*, 935 F.2d 445, 462–63 (2d Cir. 1991) ("[The right to control] theory is predicated on a showing that some person . . . has been deprived of potentially valuable economic information.").[13] Here, petitioner's fraudulent misstatements and omissions caused just such economic harm.

The government presented evidence that petitioner's misrepresentations and omissions were material to the average investor and that, when petitioner's fraud came to light, Friedman's

---

[13] Petitioner argues that *Wallach* is no longer valid as a result of *Skilling*. However, since the Court's decision in *Skilling*, the Second Circuit has continued to cite with approval *Wallach*'s holding. *See United States v. Kalish*, 403 Fed. Appx. 541, 546 n.6 (2d Cir. Nov. 24, 2010). I also note that *Wallach* was decided when *United States v. McNally*, 483 U.S. 350 (1987), was controlling, and, in *McNally*, the Supreme Court had struck down *all* honest services fraud prosecutions.

18

shares dropped precipitously, causing millions of dollars of loss to Friedman's shareholders. Therefore, any current investors who decided to maintain their shares based on petitioner's misrepresentations, and any members of the public who invested in Friedman's as a result of the misrepresentations made in the September 2003 prospectus, were deprived of valuable economic information that resulted in tangible harm to their property (shares of Friedman's stock). The cases cited by petitioner do not suggest a different outcome. For example, in *United States v. Mittelstaedt*, 31 F.3d 1208 (2d Cir. 1994), the court noted that, "Where an individual standing in a fiduciary relation to another conceals material information that the fiduciary is legally obligated to disclose, that non-disclosure does not give rise to mail fraud liability *unless the omission can or does result in some tangible harm.*" *Id.* at 1217 (emphasis added).

In sum, Petitioner's arguments based upon the evidence presented by the government at trial are rejected.[14]

### III. PETITIONER'S SIXTH AMENDMENT CLAIM

Petitioner's Sixth Amendment claim is also procedurally barred. Petitioner does not dispute that he raised his Sixth Amendment claim before the Second Circuit on direct appeal. He merely asserts that the Circuit did not decide the claim, and therefore he should be allowed to reassert it in a habeas corpus petition. This argument is without merit.

"Section 2255 may not be employed to relitigate questions which were raised and considered on direct appeal." *Riascos-Prado v. United States*, 66 F.3d 30, 33 (2d Cir. 1995). As discussed, petitioner concedes he raised his Sixth Amendment issue on direct appeal. The Court of Appeals rejected petitioner's arguments. Petitioner's position, that the Court of Appeals considered and rejected only his argument that this court abused its discretion, and that it did not

---

[14] Because I find that petitioner's claims have been procedurally defaulted and in any event are without merit, I need not perform a harmless error analysis.

consider and reject his Sixth Amendment argument, is unsound. To begin with, there is no requirement that the Court of Appeals specify each and every argument that it rejects. The petitioner having raised his Sixth Amendment argument, and the Court of Appeals having affirmed the conviction, he cannot now raise his Sixth Amendment claim again.[15]

In short, Stinn presented his bases for reversal of his conviction, and the Second Circuit rejected his claim. He may not now relitigate that claim on collateral review.

## CONCLUSION

For the reasons stated above, Stinn's petition for a writ of habeas corpus is denied. Because petitioner has not made a "substantial showing of the denial of a constitutional right," I will not issue a certificate of appealability. *See* 28 U.S.C. § 2253(c).

**SO ORDERED.**

**_electronic signature/s/____**
**NINA GERSHON**
**United States District Judge**

Dated: April 18, 2012

---

[15] In any event, it is plain from the Circuit's Summary Order that it considered the propriety of Juror 10's dismissal under both Rule 23(b)(3) *and* the Sixth Amendment. The Circuit stated that

> We likewise do not conclude that the District Court 'abused its discretion' in removing Juror 10 pursuant to rule 23 (b)(3) of the Federal Rules of Criminal Procedure . . . . After questioning Juror 10 about her communication with a third party regarding the case, the district judge reasonably concluded that Juror 10's 'extremely serious misconduct' warranted her dismissal. Gov't App. 225. [T]here is no evidence that Juror 10 was removed due to her holdout status. *See United States v. Baker*, 262 F.3d 124, 131 (2d Cir. 2001).

The *Baker* citation references *United States v. Thomas*, 116 F.3d 606, 622 (2d Cir. 1997), which held that, in order to preserve a defendant's Sixth Amendment right to a unanimous jury, "if the record discloses any possibility that a complaint about a juror's conduct stems from the juror's view of the sufficiency of the evidence, the court must deny the request to dismiss the juror." Moreover, it could not have been within this court's discretion to dismiss Juror 10 if the dismissal violated the Constitution.